THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LOUIS CINTRON, Appellant.

Second Department, May 27, 1980

## APPEARANCES OF COUNSEL

*Harvey L. Greenberg* (*Bruce Regenstreich* on the brief), for appellant.

*Eugene Gold, District Attorney (Adrian Mecz* of counsel), for respondent.

## OPINION OF THE COURT

O'Connor, J.

Responding to disturbing and distressing information received during the morning hours of July 6, 1975, the police unearthed the bullet riddled body of Angel Ortiz from a shallow grave in the basement of the El Bolero bar. Bullets had penetrated the brain, heart, and spine of the deceased. Defendant, Louis Cintron, stands convicted of this brutal slaying. He urges, *inter alia,* that serious deficiencies in the trial court's charge to the jury deprived him of a fair trial. We do not agree, and affirm the conviction. The provocative and elusive issue posed by this appeal revolves around a determination as to when the court, *sua sponte,* is mandated to charge on the potential issue of intoxication.

### THE FACTS

In convicting defendant, the prosecution relied primarily upon the testimony of two key witnesses. Graciella Rodrigues, who had known defendant for three years prior to this incident, testified that she arrived at the El Bolero at 2:30 A.M. and Ortiz appeared at about 4:00 A.M. An argument soon arose between Ortiz and Vidal, the manager of the establishment. As the disagreement continued, defendant reached around the witness and shot the unarmed Ortiz from close range. After Ortiz slumped to the floor, defendant fired several more shots into his vulnerable and defenseless victim. At this point, many of the late hour drinkers hastily exited the premises. Cintron directed Graciella to look for the spent shells and ordered Carlos Torres, an employee of the bar, to clean up the blood. Vidal thereafter decided that it would be best to bury the body in the basement. After locking the doors, both front and rear, to prevent any of the remaining employees and patrons from leaving, Vidal and Cintron removed the corpse to the basement. When the burial was completed, Cintron returned from the cellar dusting off his clothes. As Cintron displayed a gun, Vidal warned those present to remain silent about what had transpired. The doors were re-opened about 7:30 A.M. and Rodrigues promptly sought the police, to there relate her grim, gruesome, and grisly tale of the night's events.

On cross-examination, defense counsel was able to establish that Ortiz, the victim of the shooting, was Rodrigues' brother-in-law; that she had been drinking at both the El Bolero and Los Pannchos bars prior to the shooting; that she drank even after the shooting; and that she had failed to call the police from the bar while the body was being secreted. She denied that Cintron and her brother had argued prior to this incident.

Edith Sanchez, spending her first evening as a barmaid at the El Bolero on the night of the murder, corroborated the Rodrigues testimony. She saw the shooting and testified that she was locked in the premises during the burial. An effective cross-examination elicited testimony that Sanchez knew Ortiz and Graciella Rodrigues prior to this incident; that she did not go to the police for one week after the shooting; and that some of the Rodrigues family had sought to visit her subsequent to the event. She denied that Graciella had informed her that she must testify.

Louis Cintron, a married man with two children and no prior criminal record, took the stand in his own defense. He related that he began the evening of July 5, 1975 at La Terrucca Social Club, and during his stay there, from 9:00 P.M. to 1:30 A.M., he had about 20 drinks of scotch and also played pool. He thereafter took a walk of 5 to 10 minutes to the El Bolero bar, then occupied by 20 to 25 people, where he had another 15 to 20 drinks. At that point he saw about seven people gathered while a discussion went on. He suddenly heard three shots from an unknown direction, and the people scattered. When he went over to see what happened he saw the body of a person unknown to him on the floor. The defendant further testified that he returned to his table, drank some more, observed Torres clean the blood, and left the premises at 5:30 A.M. That evening he left for Puerto Rico, where his family was awaiting him. He returned to New York and surrendered to the police several weeks later when he learned from his brother, a policeman in Puerto Rico, that a warrant had been issued for his arrest. Several weeks prior to the shooting he had been involved in a scuffle with Graciella's brother Phillip. Cintron concluded his direct testimony by denying any involvement in the shooting or burial of Ortiz.

Despite the testimony about his voluminous alcoholic consumption on the night of July 5, during cross-examination defendant stoutly denied that he had been drunk. He asserted:

"I can drink three bottles and I never get drunk." He admitted that Vidal was his friend and he had known him five years. He further testified that when he viewed the body of the deceased, nobody would answer his queries about what had occurred. When he left the premises, the body was still on the floor.

Defense counsel's summation was premised upon Cintron's denial of any involvement in the incident. Pointing out that his client was a solid family man with no record, counsel argued that Sanchez and Rodrigues were trying to frame his client. Various internal inconsistencies in the testimony of these crucial prosecution witnesses and discrepancies between their individual stories were forcefully set forth for the jury's consideration. It was urged that Rodrigues had forced Sanchez to testify, and an insinuation was proffered that Vidal was the real culprit.

Counsel did not ask for a charge on intoxication. A request that manslaughter in the second degree be charged was rejected "because it does not fit". The jury, presented with sharply defined issues, concluded that Sanchez and Rodrigues were credible, that no "frame" was involved, and that Cintron did indeed shoot Ortiz.

## THE LAW

The obligations and duties of a trial court in giving its charge to the jury, insofar as herein relevant, are set forth in CPL 300.10 (subd 2), which in part provides: "In its charge, the court must state the fundamental legal principles applicable to criminal cases in general * * * The court must also state the material legal principles applicable to the particular case, and, so far as practicable, explain the application of the law to the facts". It is defendant's prime contention on appeal that based upon his testimony that he had approximately 40 drinks on the night in question, the court, on its own initiative, was obligated to charge the jury on the potential defense of intoxication as it related to the issue of intent. It is further argued that it was reversible error to refuse to charge manslaughter in the second degree (see Penal Law, § 125.15). In the context in which the defense was presented, it is unclear whether defendant's argument is premised on a claim that his alleged intoxication diminished his intent to the level that his conduct could be interpreted as being merely reckless, or whether it is based on a contention that even the acts of a

sober individual could be viewed as reckless under the evidence introduced at trial. It is difficult to understand why defense counsel would request a charge of manslaughter in the second degree without including a request for a charge on intoxication if in fact diminished capacity was being argued. No reasonable view of the record would support a conclusion that Cintron's acts were merely reckless absent a diminished mental capacity based upon besottedness, so for purposes of this appeal it will be assumed that the alleged error in this regard is inextricably interwoven with the inebriation allegations presently being advanced.

In recently rejecting a challenge to subdivisions 1 and 3 of section 1192 of the Vehicle and Traffic Law[1] as being unconstitutionally vague, the Court of Appeals offered the following astute observations (People v Cruz, 48 NY2d 419, 426): "[T]he Legislature recognized that the average person can consume a certain amount of alcohol without impairing his ability to operate a motor vehicle * * * [T]he Legislature also recognized that some individuals may be able to consume greater amounts of alcohol without being impaired * * * Thus the impairment statute, by simply providing prima facie standards, takes into account the 'subjective' tolerance of individuals in determining the ability to drive possessed by a defendant at the time of arrest."

The subjective element present in the interaction of the operation of the mind in forming an intent and intoxication has also been commented upon as follows (People v Leonardi, 143 NY 360, 365-366): "That a man may be even grossly intoxicated and yet be capable of forming an intent to kill or do any other criminal act is indisputable, and if, while so intoxicated, he forms an intent to kill and carries it out with premeditation and deliberation, he is without doubt guilty of murder in the first degree, and the jury should, when such a defense is interposed, be so instructed * * * [W]here the criminal act is fairly and clearly proved, the fact of intoxication as furnishing evidence of the want of the criminal intent which the proof might otherwise show, should be considered by it with the greatest care, caution and circumspection, and such fact ought not to be allowed to alter the character or

---

1. "§ 1192. Operating a motor vehicle while under the influence of alcohol or drugs.

"1. No person shall operate a motor vehicle while his ability to operate such motor vehicle is impaired by the consumption of alcohol. * * *

"3. No person shall operate a motor vehicle while he is in an intoxicated condition."

grade of the criminal act unless they have a fair and reasonable doubt of the existence of the necessary criminal purpose or intent after a consideration of such evidence of intoxication."

The foregoing indicates that there is an undeniable subjective element of intoxication, and that even an inebriated individual may be capable of forming an intent. At the time defendant took the stand, he was free to assert that his drinking on the evening in question had negated his ability to form an intent to kill. That he chose to deny any involvement in the murder, as opposed to asserting a claim of diminished mental capacity, can hardly be deemed a surprising choice in light of the evidence already adduced at the trial which strongly indicated that defendant was in full control of his actions prior to the shooting. Earlier proof indicated that a steady hand had put three carefully placed bullets into highly vulnerable parts of the body of the deceased; that after this cold-blooded execution, defendant had the presence of mind to direct a bar customer to find the spent shells; that the victim of the crime was engaged in a heated argument with defendant's friend; that defendant not only had the presence of mind to calmly lock the doors while the body was disposed of, the blood washed away, and the witnesses threatened with violence if they did not remain silent, but that he even was concerned enough about his appearance to dust his clothes off after engaging in the dirty job of interring the body in the basement; and that by promptly leaving the country, defendant made himself unavailable to the police for several weeks after the murder. It is also noteworthy that there was not even a scintilla of objective or subjective proof prior to defendant testifying which in any way indicated intoxication.

What defendant had working in his favor prior to his taking the stand was his family background and clean record; the forceful impeachment of the two key prosecution witnesses; and the presentment to the jury of a potential motive for these key witnesses perjuring themselves when they testified. It is anything but surprising that defendant chose to minimize the only evidence of intoxication, his own bare statements of the number of drinks he consumed during the hours of 9:00 P.M. and 5:30 A.M., because the extremely viable defense of an absolute denial of any involvement in the crime hinged upon his being aware of exactly what happened the night somebody shot Angel Ortiz. Defendant thus testified that he was fully

sober despite his drinking, and was alert enough after an evening of drinking and socializing to distinctly hear three shots at the time Ortiz was slain. During his visit to La Terrucca he retained sufficient dexterity to play pool, and sufficient initiative thereafter to walk over to the La Bolero bar at 1:30 A.M. His subsequent departure for Puerto Rico to be with his family was simply consistent with his prior history as a husband and father. Defendant wanted the jury to believe that his denial of involvement in the crime was the denial of a man in full control of his faculties who was keenly aware of exactly what had transpired. Unfortunately for defendant, the jury rejected his protestations of innocence.

To now urge upon this court that reversible error exists in the failure to charge the jury on the potential issue of intoxication is untenable. The only evidence of intoxication consisted of the bare statements of defendant as to the number of drinks he consumed, and this same witness insisted that he was clear-headed and lucid at all times. Certainly a defendant may present alternate defenses that he did not commit a crime, and if he did intoxication should prevent him from being held to account for his deed because of his diminished capacity. Defendant here made a reasoned decision not to pursue this course. From his perspective, he chose to believe that the potential persuasiveness of the defense presented may have been irreparably damaged by sidetracking the jury with an alternative defense. If the court had taken upon itself the obligation of explaining intoxication to the jury, serious questions may have been raised about the denial of a fair trial by reason of an undue interference with the carefully plotted strategy of the defense. Hindsight may not now be interjected into the proceedings to upset a properly obtained conviction. As stated in *People v Zackowitz* (254 NY 192, 202, dissenting opn of POUND, J.):[2] "On the theory that defendant repudiated intoxication as a partial defense, tending to reduce the degree of the crime, the court did not instruct the jury on the question of intoxication. (Penal Law, § 1220.) In the circumstances, the judgment should not be reversed on this ground as the defendant did not make the question a serious one. *(People v. Van Zandt,* 224 N.Y. 354; *People v Koerber,* 244 N.Y. 147, 150.)"* As further stated in *People v Morrison* (58 AD2d 699): "Similarly, there was no error in the court's

---

2. The conviction was reversed on grounds not herein relevant, thus not diminishing the importance of this aspect of Judge POUND's dissent for affirmance.

refusal to charge the effect which intoxication might have had upon defendant's culpability * * * Even though intent is an element of the crime charged * * * defendant's alleged intoxication is not relevant in this case because his own testimony concerning the evening in question establishes that he was fully aware of what was occurring and what he was doing."

The cases relied upon by defendant are fully distinguishable. In *People v Jackson* (14 NY2d 5), *People v Koerber* (244 NY 147), *People v Leonardi* (143 NY 360, *supra), People v Piranian* (47 AD2d 668), *People v Orr* (43 AD2d 836, affd 35 NY2d 829) and *People v De Mino* (277 App Div 1121), there was sufficient evidence of intoxication to warrant the defense requesting an intoxication charge. Hence, these decisions were reached as questions of law, and did not require the exercise of discretion now being sought by defendant for his benefit. In *People v Lee* (35 NY2d 826, 827) it was error to refuse to give a requested charge of manslaughter in the second degree, despite defendant's protestations of sobriety, because alcohol was detected on his breath and his behavior, unlike the rational, calculating actions of Cintron here, was characterized as without "any plausible explanation", "bewildered" and "ingenuous", and his crime was viewed as "bizarre". In *People v Walker* (58 AD2d 737) a manslaughter in the second degree charge was requested and given because of the strong proof of intoxication.

Reversals have been required in the interest of justice where the record amply supported the need to give an intoxication or alternate defense charge. In *People v Van Zandt* (224 NY 354) there was adequate proof of potential intoxication. In *People v Rivera* (74 AD2d 589) a reversal in the interest of justice was required because of the failure to give a justification charge, although defendant denied the assault completely, because there was sufficient proof to warrant such a charge and the jury actually considered "self defense" in its deliberations. In *People v Nater* (56 AD2d 664) it was uncontested that defendant was high on methadone. In *People v Trisvan* (49 AD2d 913) it was uncontested that the defendant had taken heroin and consumed large amounts of alcohol. In *People v Brown* (5 AD2d 819) the record set forth a solid foundation for requiring a charge on excusable homicide.

In short, the charge in this case was not deficient because the posture of the positions taken did not justify the presentation of an intoxication factor to the jury. Defendant's other

contention is without merit. Accordingly, the judgment of conviction should be affirmed.

RABIN, J. P., GULOTTA and COHALAN, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered January 18, 1977 and amended on January 31, 1977, affirmed.