OPINION OF THE COURT
Alan Broomer, J.
Defendant, under indictment for murder in the second degree, attempted murder in the second degree and criminal possession of a weapon in the fourth degree, has interposed an insanity defense and waived a jury. The case has been tried. This is my verdict and the underlying reasoning.
THE FACTS
Jose Parmes (defendant) watched television in Iris Torres’ (his girlfriend — the deceased) apartment through the evening of May 23,1981 into the early morning of May *504 24, 1981. He left around 5:00 a.m. and went to the apartment of Celeste Holmes (in the same apartment building) towards whom he was romantically inclined. Within 10 minutes of his arrival they were joined by two male friends of Holmes. The foursome shared V2 gram of cocaine (snorted), some marihuana cigarettes (smoked), wine (drunk) and an alcoholic drink thought to be scotch. The cocaine was completely consumed within an hour.
The defendant felt unusual after drinking the scotch — it seemed as if he were receiving threats from the two men. He left the Holmes apartment, still feeling unusual he wandered about for 20 minutes and then went to the 120th Police Precinct “for help because he believed someone had placed something in his drink.” After 20 minutes he left the precinct and returned to Torres’ apartment. He wakened her and told her where he’d been and how he felt — they both cried. The next thing defendant remembers is awakening in a hospital.
Shortly after 9:00 a.m. the defendant was seated on the sill of an open window in the deceased’s sixth-floor apartment. His back to the street, he was dangling an infant by her arm out over the street below. (She was his year-old daughter by another woman.) He was looking into the apartment and calling to the deceased, “Come here bitch, I’ll break its * * * arm.” She called to him, “No stop, no stop,” as did a man in the street below. The defendant then swung the baby out in space and released her. She landed on a fourth-floor fire escape — sustaining a fractured skull and other injuries — she survives. The defendant left his perch on the window sill and the deceased was heard screaming from within the apartment.
Shortly after 10:00 a.m. the police arrived. Several tried unsuccessfully, to force the apartment door. Others took up positions on fire escapes alongside and above the window where defendant had appeared. He reappeared in an adjoining window and for 15 minutes responded obscenely to police exhortations to open the door and come out.
At one point he was told to “take it easy and talk to the men at the door.” He replied, “No she’s dead.” When an officer tried to reassure him with, “No she’s not, the baby’s *505 all right,” he said, “F* * * you and f* * * the baby.” When told again that the baby was all right, he stated, “No she’s dead.” He then left the window only to reappear shortly in an adjoining window.
Again the police “What’s wrong, what’s the matter?” The defendant, “They put something in my drink, I’m going to go.” The police, “Wait, give me a telephone number, I’ll call your family.” The defendant, “You know, you f* * *, I’m going to go.” “This is the way I’ll come out.”
Shortly the defendant released his grip on the window frame and slid backwards out the window and fell to the street below. His fall was broken by a railing and he survives after sustaining severe injuries.
The deceased’s apartment was entered — she was lying dead within. She had been severely beaten. She had numerous fractures of the face, and skull, sharp cut injuries, both ears were severed and protruding from her back were three knives and a carving fork. She died as a result of a combination of all her injuries, she was still alive when stabbed in the back.
The defendant had been enrolled in various colleges since 1978, as a premed student. In 1979 after using cocaine and marihuana he struck a woman. The woman’s brother and mother immediately retaliated by stabbing him and striking him over the head with a table. He spent three days in the hospital — diagnosed as having sustained a concussion. After the incident he claims he became fearful and thought someone was trying to hurt him. He had religious feelings and a desire to reform, to stop using drugs and doing the wrong thing and to stop going back on his word. He continued to use cocaine however, usually three times a week and to smoke marihuana as often. The two drugs were indulged together, often accompanied by some wine. This case and the 1979 incident are the only bizarre episodes experienced in the defendant’s 28 years.
DISCUSSION
The facts surrounding the crimes charged were not seriously challenged nor controverted by the defendant’s evidence.
*506 The only issue deserving of serious consideration is the defendant’s state of mind at the time of the incident. Was he acting in a state of diminished capacity by reason of mental disease or defect, extreme emotional disturbance of voluntary intoxication? If the answer is yes, then the result is either lessened responsibility or no responsibility.
Two psychiatrists testified, one for the defense the other for the prosecution. Predictably, they expressed diametrically opposite opinions concerning the defendant’s mental state.
EXTREME EMOTIONAL DISTURBANCE
Section 125.25 (subd 1, par [a]) of the Penal law provides for an affirmative defense where: “The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant’s situation under the circumstances as the defendant believed them to be.”
This defense is broader than the “heat of passion” doctrine which it replaced in that a “cooling off” period intervening between the fatal act and the disturbance, does not negate the defense. A spontaneous explosion is not required. Indeed a defendant can properly assert the defense even where he has been “simmering” for some time as a result of some mental trauma. (See People v Patterson, 39 NY2d 288.)
I must conclude from all the facts that a violent explosion of some duration (over one hour) occurred. However, I am unable to find that it was preceded by the requisite “extreme emotional disturbance” in the first instance, and that even if that state existed, I cannot find a “reasonable explanation or excuse” for it. Both factors are necessary conditions which must be proved by a preponderance of the evidence, before the defense can be established. Failing to prove either means the defendant is not entitled to the leniency which the defense calls for in a proper case. (See People v Casassa, 49 NY2d 668.)
THE INSANITY DEFENSE
Subdivision 1 of section 30.05 of the Penal Law precludes criminal responsibility where at the time of the wrong, “as *507 a result of mental disease or defect, [the defendant] lacks substantial capacity to know or appreciate either:
“(a) The nature and consequences of such conduct; or
“(b) That such conduct was wrong.”
The defendant’s psychiatrist, Dr. Nadell, testified that at the time of the incident the defendant had the relatively rare disorder of “intermittent explosive syndrome.” As a result of this disorder the defendant was mentally ill and consequently was unaware of what he was doing and was equally unable to distinguish right from wrong.
The doctor conceded that the defendant had no psychiatric history prior to May 24, 1981, that he did not ask the defendant if he used cocaine combined with other substances, that he was not a “board certified” forensic psychiatrist, that he did not belong to any forensic psychiatric group, that he previously had testified only for the defense, that he failed to examine the defendant’s Bellevue medical records and the autopsy reports, that defendant did not feel he had any enemies nor did he hear voices or have any delusions or hallucinations and that the defendant’s declining grades in college were evidence of his disorder.
The People called Dr. Stanley Portnow, a doctor of broad experience in forensic psychiatry, who had testified in court more than 40 times and for both the defense and prosecution. He concluded that the defendant had no history of mental disease or defect prior to May 24,1981, that the defendant was not substantially impaired because of mental disease or defect on that date and had the capacity to know and appreciate the nature and consequences of his acts and that they were wrong. Although Dr. Portnow did not believe the defendant had a mental disease or defect but “giving him the benefit of the doubt”, it would be “mixed organic brain syndrome.” He specifically rejected Dr. Nadell’s diagnosis of intermittant explosive disorder because on the two occasions that the defendant “acted out”, the genesis or cause was voluntary, i.e., intoxication.
The fact finder must decide the issue of legal responsibility. The expert’s opinions are not binding on the fact finder but are offered for its guidance. (Dougherty v Milliken, 163 NY 527, 533.)
*508 Based on all the testimony in the case I reject Dr. Nadell’s diagnosis and his conclusions as pure bootstrapping. I find that the defendant had no prior history of mental disease or defect; that at the time in question he was a premedical student well in touch with reality. That several hours before his fatal acts he voluntarily along with others snorted cocaine, smoked marihuana and drank a small quantity of wine and scotch. That he was oriented and although “feeling strange” knew where he was and acted rationally. He was able to reason that his queer feeling was caused by “something in his drink”; he was able to seek help from the police (although they have no recollection of seeing him), find his way home, enter his apartment and complain to the deceased. As Dr. Portnow testified, “He knew it was his child he was dangling out the window, not a rag doll.” When told by the police the child was alive (after he had tossed her from a sixth-floor window) he replied quite logically, “No she is dead.” His final act of defenestration was a knowing and conscious reflection of “the jig is up, it’s all over now” mentality. When he went out that window he believed the fall would kill him. He knew he wouldn’t float to earth or fly. That he is before me now, is a consequence of his unintended survival.
I find that the People have proved beyond a reasonable doubt that the defendant on May 24, 1981, was:
(a) not suffering from a mental disease or defect;
(b) possessed of substantial capacity to know and appreciate the nature and consequences of his acts; and
(c) aware that his acts were wrong.
VOLUNTARY INTOXICATION
Although not a defense to criminal charges, voluntary intoxication may be considered in mitigation of the severity of the act charged. The finder of the fact must determine the degree of intoxication and what effect it had on the defendant’s ability to form the specific intent required for the crimes charged.
A man may be so drunk that he could not possibly have formed the specific intent to steal a car, yet he may have possessed sufficient awareness to have entered somebody *509 else’s car, started it and promptly driven it into a tree. He could be found guilty of unlawful use of the car but be found so lacking in capacity he could not have formed the intent to steal the car.
Section 15.25 of the Penal Law provides that: “Intoxication is not, as such, a defense to a criminal charge; but in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged.”
Although the defendant testified he was a regular user of cocaine, even if he were addicted it would not excuse his commission of a crime. (People v Borrero, 19 NY2d 332.) The rule is the same where a defendant is under the influence of drugs at the time a crime is committed. (People v Brown, 57 AD2d 869.) That an individual is drunk when he commits a crime is not controlling. (People v Cintron, 74 AD2d 457.) The relevant factors are the degree of intoxication and what effect it had on a defendant’s ability to form a specific intent to commit the crimes charged. (People v Leary, 64 AD2d 825.)
Here the active “intoxicant” was cocaine. The amount of alcohol and marihuana consumed was not significant. However, even assuming defendant was intoxicated by his voluntary ingestion of drugs, the acts were committed well in excess of one hour afterward. Dr. Portnow testified that cocaine intoxication peaks within one hour. Therefore I find that the defendant had sufficient capacity to form the specific intent required for the crimes charged. He may still have felt the effects of the drugs he had consumed. They may have dissipated his inhibitions against violence but they certainly did not render him incapable of forming the specific intent needed to commit the acts charged.
CONCLUSION
The defendant has failed to establish the defense of extreme emotional disturbance. The People have proved beyond a reasonable doubt that the defendant did not have a mental disease or defect and that he possessed the requisite mental culpability required for the commission of the indicted crimes. Since I’m satisfied beyond a reason *510 able doubt that the defendant committed the crimes charged I find him guilty as charged.