STATE OF HAWAII, Plaintiff-Appellee, *v.* ALIIELUA UI, Defendant-Appellant

NO. 8820

CRIMINAL NO. 55660

MAY 4, 1983

LUM, C.J., NAKAMURA, PADGETT AND HAYASHI, JJ., AND CIRCUIT JUDGE ACOBA, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY HAYASHI, J.

Defendant-appellant Allielua Ui appeals from an order approving fees totaling $4,000 for his court-appointed attorney, $1,553.50 less than the amount requested; appellant contends the authorization of only part of the fees requested was the result of the trial court's misinterpretation of the excess payment provision of Hawaii Revised Statutes (HRS) § 802-5(b) (Supp. 1982). The State, while supporting the lower court's interpretation of the statute, questions this court's jurisdiction to entertain this appeal under HRS § 641-11, the provision relied upon by appellant. We agree that we lack jurisdiction under HRS § 641-11, and although this court has supervisory jurisdiction over inferior courts pursuant to HRS § 602-4, "to prevent and correct errors and abuses therein where no other remedy is expressly provided for by law," we decline to exercise such jurisdiction in this case because we believe the circuit court properly interpreted and applied the statute.

I.

Appellant was charged with three class A felonies.[1] The circuit court, pursuant to a recommendation by the public defender, appointed private counsel to represent appellant.

Following a mistrial of the case, appellant's court-appointed counsel moved for approval of attorneys fees totaling $5,553.50 pursuant to HRS § 802-5(b). Although the court found the requested fees justified, it concluded HRS § 802-5(b) limited the amount of fees allowable for this type of case to $4,000; thus, a fee of only $4,000 was approved. Appellant appealed. The indictment against appellant has been dismissed with prejudice.

II.

Appellant contends HRS § 641-11 affords him the right to appeal; the statute provides in pertinent part:

Any party deeming himself aggrieved by the judgment of a circuit court in a criminal matter, may appeal to the supreme court, subject to chapter 602 in the manner and within the time provided by the Hawaii Rules of Criminal Procedure. The sentence of the court in a criminal case shall be the judgment.

Thus, the statute affords a *party,* deeming himself *aggrieved* by the *judgment* of a circuit court, the right to appeal.

Initially, it should be noted that although the attorney appears to be the one aggrieved by the order of the court, the appeal was brought in the name of his client, defendant-appellant; this is probably because the language of § 641-11

---

[1] The only question raised on appeal by appellant is the proper construction of the excess payment provision of HRS § 802-5(b), thus, we do not deal with the question of whether each count could constitute a separate case for the purpose of calculating attorney fees.

purports to only allow a party the right to appeal from an adverse judgment.

The appeal in the instant case is from an order granting part of the attorney fees requested. The State contends the order is not an appealable order under the statute, citing *State v. Johnston,* 63 Haw. 9, 619 P.2d 1076 (1980) for the proposition that an appeal may only be had from a sentence of the circuit court. In *Johnston,* this court dismissed an appeal brought from an order denying a motion to dismiss an indictment, holding that "such order [was] interlocutory and [was] not a *final order or judgment.* It [was] therefore not one that [was] appealable under HRS sec. 641-11." *Id.* at 11, 619 P.2d at 1077. (emphasis added). Thus, *Johnston* did not definitively rule that an appeal under HRS § 641-11 must be from a sentence in a criminal case. It could be read to imply an appeal may also be brought from an order deemed to be final. An order awarding attorneys fees under the Criminal Justice Act to counsel appointed for indigent defendants has been ruled as being a final order within the meaning of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *Matter of Baker,* 693 F.2d 925, 926 (1982). Thus, the viability of this appeal may depend in part upon whether the judgment appealed from must be a sentence; however, since we conclude appellant lacks standing to bring this appeal, we do not need to decide this issue.

The State also challenges appellant's standing to bring this appeal since appellant is allegedly not aggrieved by the order. An aggrieved party is "[o]ne whose legal right is invaded by an act complained of, or whose pecuniary interest is directly affected by a decree or judgment." Black's Law Dictionary 60 (5th ed. 1979). Similarly, this court has held an "aggrieved party" in the civil context is "one who is affected or prejudiced by an appealable order." *Montalvo v. Chang,* 64 Haw. 345, 351, 641 P.2d 1321, 1326 (1982).

Appellant does not aver that he is in any way affected or prejudiced by the order but rather that he "has an interest in seeing that his court appointed attorney is properly compensated both for his fees and expenses." (Defendant-appellant's Reply Brief at 1).

The only thing we can surmise from the case[2] cited by appellant for the proposition that he has a protectable interest in this appeal is "inadequately" compensated counsel impaired his right to effective assistance of counsel guaranteed by the Federal and State Constitutions.

One of the reasons for requiring that assigned counsel be reasonably compensated is to assure quality representation for indigent defendants. 1 ABA Standards for Criminal Justice commentary to sec. 5-2.4. The concern for the quality of representation afforded an indigent defendant flows from the constitutional right to effective assistance of counsel. *United States v. Bailey*, 581 F.2d 984, 988-89 (1978).

Although in a given case a defendant's right may be impaired if his court-appointed counsel is not adequately compensated, *see People v. Randolph*, 35 Ill.2d 24, 219 N.E.2d 337 (1966), this does not seem to be such a case. In the instant case, the indictment against appellant has been dismissed with prejudice, no doubt, as a result of his counsel's diligent and able efforts. Moreover, that appellant is not challenging the effectiveness of his counsel's representation is further evidenced by the fact that the record on appeal consists only of the documents dealing with counsel's request for fees. We hold appellant lacks standing to appeal the order approving partial attorney fees.

Although this court lacks jurisdiction under HRS § 641-11, we could nevertheless invoke our supervisory powers under HRS § 602-4 to prevent and correct error and abuses where no other remedy is expressly provided for by law. However, we do not believe this is a proper case for us to exercise such jurisdiction since we feel, as stated below, the circuit court properly interpreted and applied the statutory provision at issue.

---

[2] The case, *State v. District Court*, 85 Nev. 241, 453 P.2d 421 (1969), cited by appellant deals with an indigent defendant's constitutional right to have his counsel reimbursed for out-of-pocket expenses incidental to preparing defendant's defense, and, thus, is not applicable to the instant case. Although appellant's counsel had to pay the $50 filing fee for this appeal as his request to have costs waived on appeal was denied, the propriety of such denial has not been questioned by appellant.

### III.

The statutory provision in question is the last sentence of HRS § 802-5(b) which provides:

Payment in excess of any maximum provided for under paragraphs (1), (2), and (5), where extended or complex representation is needed, may be made for good cause shown on the record by the appointing judge, but shall not exceed an amount twice the maximum allowable fees for such representation.

Appellant contends this sentence means *payment in excess* shall not exceed twice the maximum. Since this was a class A felony case providing for a maximum fee of $2,000, the limit of the excess payment should be $4,000, thus, entitling counsel to a possible total fee of $6,000 ($2,000 maximum + $4,000 excess payment).

Conversely, the State argues the sentence means *total payment* shall not exceed twice the maximum, thus, payment to counsel could not exceed $4,000. The circuit court, agreeing with the State's interpretation, approved fees of only $4,000.

"[O]ur primary duty [in interpreting and applying statutes] is to ascertain the intention of the legislature and to implement that intention to the fullest degree." *Keller v. Thompson,* 56 Haw. 183, 189, 532 P.2d 664, 669 (1975). "The intention of the legislature is to be obtained primarily from the language contained in the statute itself." *In re Hawaiian Telephone Co.,* 61 Haw. 572, 577, 608 P.2d 383, 387 (1980). However, "where the language of a statute is ambiguous or of doubtful meaning, . . . judicial construction and interpretation are warranted," *Id.* at 578, 608 P.2d at 387, and "[c]ourts may take legislative history into consideration in construing a statute." *Life of the Land v. City and County,* 61 Haw. 390, 447, 606 P.2d 866, 899 (1980).

Appellant contends the language of the statute unambiguously limits the *excess payment* and not the *total payment* to an amount twice the maximum fees allowable under HRS § 802-5(b)(1) for a class A felony case. We feel that the statute lends itself to the interpretations proffered by both the appellant and the State. Moreover, this court has stated, "'[w]hen aid to construction of the meaning of words, as used in the statute is available, there certainly can be no "rule of law" which forbids

its use, however clear the words may appear on "superficial examination."'" *Black Construction v. Agsalud,* 64 Haw. 274, 283-84, 639 P.2d 1088, 1094 (1982); *see* 2A Sutherland, Statutory Construction § 48.01 (4th ed. 1973).

HRS § 802-5(b) was enacted during the legislature's 1981 special session. The Senate Committee Report provides in pertinent part:

The bill provides:

. . . .

(3) That payment in excess of and up to twice the amount in the schedule of fees is allowed when the case is extended or complex;

Sen. Stand. Comm. Rpt. No. 4, in 1981 Senate Journal Special Session, at 28; House Stand. Comm. Rpt. No. 24, in 1981 House Journal Special Session, at 43.

The above-quoted sentence illustrates that although the legislature intended to allow for payment in excess of the scheduled fees in certain cases, it only allowed for payment of up to twice the amount of the scheduled fees, as the circuit court correctly concluded.

Appeal is dismissed.

*Earle A. Partington (Schweigert & Associates,* of counsel) on the briefs for appellant.

*Jean K. Chiogioji,* Deputy Attorney General, on the brief for appellee.

MIHARU H. MIZOGUCHI, Personal Representative of the Estate of Tsutomu Mizoguchi, aka Tom Tsutomu Mizoguchi, deceased, Plaintiff-Appellee, *v.* STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Appellant

NO. 7926

(CIVIL NO. 4329)

MAY 5, 1983

LUM, C.J., PADGETT AND HAYASHI, JJ.,
CIRCUIT JUDGE CHANG, ASSIGNED BY REASON OF
VACANCY, AND CIRCUIT JUDGE HUDDY,
IN PLACE OF NAKAMURA, J., DISQUALIFIED

OPINION OF THE COURT BY LUM, C.J.

The primary issue in this declaratory judgment action is whether no-fault benefits payable under an additional no-fault coverage endorsement may exceed the aggregate limits established for basic no-fault benefits, in cases where accidental harm has resulted in death. We find that under the terms of the policy at issue and the applicable statutory provisions, the decedent's surviving spouse and dependents are entitled to payment of survivors' loss benefits and provable work loss benefits, up to the increased aggregate limits of the additional no-fault coverage.

I.

On February 15, 1979, plaintiff's decedent, Tsutomu Mizoguchi, died from injuries he sustained when the car he was driving collided with another automobile. At the time of the accident, decedent's car was insured by defendant-appellant State Farm Mutual Automobile Insurance Company (hereinafter referred to as State Farm). Decedent's insurance policy includes both basic as well as additional no-fault coverage. The additional no-fault coverage endorsement increases the aggregate limit for all no-fault benefits from the basic $15,000 limit to $50,000.

State Farm tendered $15,000 to plaintiff-appellee Miharu Mizoguchi, decedent's surviving spouse. Plaintiff, in her capacity as personal representative of decedent's estate, filed the instant declaratory judgment action, requesting additional no-fault benefits equal to the difference between the increased aggregate limit of $50,000 under the additional no-fault coverage and the $15,000 previously tendered. The trial court subsequently granted plaintiff's motion for summary judgment and denied State Farm's cross-motion for summary judgment.

II.

State Farm contends that the maximum recovery available in all cases of death is limited to $15,000, even where the insured has purchased additional coverage. State Farm relies

on the limit of liability for survivors' loss in the basic no-fault endorsement which states that

> The maximum amount payable for *survivors' loss* is $15,000 reduced by the amount of any other no-fault benefits paid or payable under this coverage.

(Emphasis in original). "Survivors' loss" benefits are defined in the policy as

> No-fault benefits payable as a result of the death of the *eligible injured person* for the benefit of *dependent survivors.* Such benefits may be paid immediately in a lump sum payment at the option of the beneficiary.

(Emphasis in original).

State Farm's position is that the additional no-fault benefit coverage does not provide any additional benefits to those payable under the basic no-fault coverage in cases involving death, rather than injury. In support of its position, State Farm cites HRS § 294-4(1) (Supp. 1982) which provides as follows:

> § 294-4 Obligation to pay no-fault benefits. Every no-fault and self-insurer shall provide no-fault benefits for accidental harm as follows:
>
> (1) Except as otherwise provided in section 294-5(c):
>
> (A) In the case of injury arising out of a motor vehicle accident to any person, including the owner, operator, occupant, or user of the insured motor vehicle, or any pedestrian (including a bicyclist), or any user or operator of a moped as defined in section 249-1 who sustains accidental harm as a result of the operation, maintenance, or use of said vehicle, the insurer shall pay, without regard to fault, to such person an amount equal to the no-fault benefits payable to such person as a result of such injury; or
>
> (B) In the case of death arising out of a motor vehicle accident of any person, including the owner, operator, occupant, or user of the insured motor vehicle, or any pedestrian (including a bicyclist), or any user or driver of a moped as defined in section 249-1 who sustains accidental harm as a result of the operation, maintenance, or use of said vehicle, the insurer shall pay, without regard to fault, to the legal representative

of such person, for the benefit of the surviving spouse and any dependent, as defined in section 152 of the Internal Revenue Code of 1954, of such person, an amount equal to the no-fault benefits payable to such spouse and dependent as a result of the death of such person, subject, however, to the provisions of section 294-2(10).[1]

State Farm points out that HRS § 294-4(1)(B), which deals with cases involving death, expressly refers to HRS § 294-2(10), whereas § 294-4(1)(A), which deals with injury cases, makes no such reference. HRS § 294-2(10) imposes maximum monetary limits for specific no-fault benefits and establishes an aggregate limit of $15,000 on the total amount of no-fault benefits payable under a standard no-fault policy.[2] State Farm

---

[1] The current language of HRS § 294-4(1)(B) (Supp. 1982) was in effect on February 15, 1979, the date of the accident in this case.

[2] The full text of HRS § 294-2(10) (Supp. 1982) is as follows:
§ 294-2 Definitions. As used in this chapter:

. . . .

(10) "No-fault benefits" with respect to any accidental harm shall be subject to an aggregate limit of $15,000 per person or his survivor and means:
(A) All appropriate and reasonable expenses necessarily incurred for medical, hospital, surgical, professional nursing, dental, optometric, ambulance, prosthetic services, products and accommodations furnished, x-ray and may include any non-medical remedial care and treatment rendered in accordance with the teachings, faith or belief of any group which depends for healing upon spiritual means through prayer;
(B) All appropriate and reasonable expenses necessarily incurred for psychiatric, physical, and occupational therapy and rehabilitation;
(C) Monthly earnings loss measured by an amount equal to the lesser of:
(i) $800 per month, or
(ii) The monthly earnings for the period during which the accidental harm results in the inability to engage in available and appropriate gainful activity.
(D) All appropriate and reasonable expenses necessarily incurred as a result of such accidental harm, including, but not limited to, (i) expenses incurred in obtaining services in substitution of those that the injured or deceased person would have performed not for income but for the benefit of himself or his family up to $800 per month, (ii) funeral expenses not to exceed $1,500, and (iii) attorney's fees and costs to the extent provided in section 294-30(a);
provided that the term, when applied to a no-fault policy issued at no cost under the provisions of section 294-24(b)(2), shall not include benefits under subparagraphs (A), (B), and (C) for any person receiving public assistance benefits.

construes the reference to HRS § 294-2(10) in § 294-4(1)(B) as an indication that the legislature intended to restrict no-fault benefits to the maximum aggregate limit of $15,000 established in § 294-2(10) in all cases where accidental harm results in death, even where additional coverage has been purchased by the insured.

State Farm's position is untenable, given the legislature's enactment of HRS § 294-11(a)(3) which expressly requires insurers to offer additional coverages and additional benefits in cases of death arising out of a motor vehicle accident. HRS § 294-11(a)(3) (Supp. 1982) provides:

§ 294-11 Required optional additional insurance.

(a) In addition to the no-fault coverages described in section 294-10 every insurer issuing a no-fault policy shall make available to the insured the following optional insurance under the following conditions:

. . . .

(3) Additional coverages and benefits with respect to any injury, death, or any other loss from motor vehicle accidents or loss from operation of a motor vehicle. An insurer may provide for aggregate limits with respect to such additional coverage so long as the basic liability coverages provided are not less than those required by section 294-10(a)(1) and (2).[3]

Every no-fault insurer is required under HRS § 294-11(a)(3) to offer additional coverages and benefits to the insured, who may choose to avail himself of such coverage. It is apparent therefore that the statutory provisions regarding basic no-fault benefits set minimum limits, which the parties are allowed to exceed. *See Yamaguchi v. State Farm Mutual Automobile Insurance Co.,* 515 F. Supp. 186, 191 (D. Haw. 1980) ("[P]arties cannot contract for less protection than that afforded by statute, but can contract for more extensive pro-

---

[3] The current language of HRS § 294-11(a)(3) (Supp. 1982) was in effect on the date of the accident.

tection.") *See also* 7 Blashfield, Automobile Law and Practice § 275.6 (Supp. 1981). State Farm's analysis ignores the possibility that other no-fault benefits, such as work loss, may be payable in cases of death, in addition to any survivors' loss benefits available to the eligible beneficiaries.

Courts in other jurisdictions, when confronted with this issue, have required that insurers pay earnings loss benefits in addition to any survivors' loss benefits in no-fault cases involving death. In *Allstate Insurance Co. v. Heffner,* 491 Pa. 447, 421 A.2d 629 (1980), for instance, the Pennsylvania Supreme Court held that a decedent's survivors are entitled to both survivors' benefits and work loss benefits under the Pennsylvania No-Fault Motor Vehicle Insurance Act. In *Muschette v. Gateway Insurance Co.,* 76 N.J. 560, 388 A.2d 964 (1978), for another example, the New Jersey Supreme Court held that a surviving spouse may recover income continuation and essential services benefits under an optional additional personal injury protection coverage, in addition to statutory death benefits.

Upon careful review of our no-fault statute and its legislative history, we conclude that our legislature intended that work loss benefits would be payable in cases of death in addition to any survivors' loss benefits and that eligible beneficiaries would be entitled to no-fault benefits up to the increased aggregate limit of any additional coverage.

The United States District Court reached the same conclusion in a recent decision interpreting the Hawaii no-fault statute, *Yamaguchi v. State Farm Mutual Automobile Insurance Co., supra.*[4] The court reasoned that

---

[4] The court in Yamaguchi v. State Farm Mutual Automobile Insurance Co., *supra,* was confronted with the situation where the deceased passenger was insured under two policies, each of which contained additional coverage with an aggregate limit of $50,000. The court held that in that situation, the eligible beneficiaries were entitled to $50,000 in work loss benefits on each of the policies, for a total judgment of $100,000, in addition to the $15,000 in survivors' loss benefits already paid by the automobile's insurer.

In this particular case, we are dealing with one insurance policy issued by a single insurer and a plaintiff who has only requested additional no-fault benefits equal to the difference between the aggregate limit of the additional coverage and the survivors' loss benefits already received.

We reserve opinion on the specific issues raised in *Yamaguchi* until a future case involving those facts comes before us.

Survivors' loss is different from and does not duplicate loss of earnings.

. . . .

. . . There is no indication in either the Hawaii no-fault law, regulations, or the insurance policies that "survivors' loss" benefits are meant to preempt or reduce "work loss" benefits, or to duplicate "work loss" benefits.

515 F. Supp. at 193.

The legislative intent to allow work loss benefits up to the aggregate limit of the policy is evident in the Conference Committee report on the no-fault bill which states in relevant part that

[A]ll wage loss would be paid until such time as the injured person could resume available and appropriate gainful activity, *up to the standard or maximum limit of every no-fault policy* . . . . Benefits would also be paid for loss of future anticipated earnings or for impairment of earning capacity resulting from injuries sustained in an automobile accident, *up to the standard or maximum limit of every no-fault policy.*

H. Conf. Comm. Rep. No. 13 on H.B. 637, 1973 House Journal 1220; S. Conf. Comm. Rep. No. 4 on H.B. 637, 1973 Senate Journal 636 (emphasis added).

By using the phrase "standard *or* maximum limit," the legislature indicated that work loss benefits are not limited only to the standard aggregate limit of the basic policy. Where the insured has purchased additional coverage, provable earning losses may extend beyond the standard $15,000 aggregate limit, up to the maximum limit of the additional coverage. Such an interpretation is far more logical than State Farm's position that the deceased insured paid additional consideration for no additional protection.

References to "accidental harm" and "death" in the statutory work loss provisions are evidence of the legislature's intent to allow work loss benefits in cases where the injured person

dies.[5] "Accidental harm" is defined by statute as "bodily injury, *death,* sickness, or disease caused by a motor vehicle accident to a person." HRS § 294-2(1) (1976) (emphasis added). The policy provisions regarding work loss are similar in language to the no-fault statute and also refer to "accidental harm."[6]

---

[5] See HRS § 294-2(10)(C) (Supp. 1982) which provides:

(10) "No-fault benefits" with respect to any accidental harm shall be subject to an aggregate limit of $15,000 per person or his survivor and means:

. . . .

(C) Monthly earnings loss measured by an amount equal to the lesser of:
(i) $800 per month, or
(ii) The monthly earnings for the period during which the *accidental harm* results in the inability to engage in available and appropriate gainful activity.

(Emphasis added).

See also HRS § 294-2(7) (1976) which states:

(7) "Monthly earnings" means:

(A) In the case of a regularly employed person, one-twelfth of the average annual compensation before state and federal income taxes at the time of *injury or death;*

(B) In the case of a person regularly self-employed, one-twelfth of the average annual earnings before state and federal income taxes at the time of *injury or death;*

(C) In the case of an unemployed person or a person not regularly employed or self-employed, one-twelfth of the anticipated annual compensation before state and federal income taxes of such person paid from the time such person would reasonably have been expected to be regularly employed.

(Emphasis added).

[6] The policy also defines "accidental harm" as "bodily injury, *death,* sickness or disease caused by a motor vehicle accident to a person." (Emphasis added).

See "no fault benefits" section in basic no-fault endorsement which defines "work loss" as "[l]oss of monthly earnings resulting from the inability of the eligible injured person to engage in available and appropriate gainful activity or a decrease in earning capacity because of *accidental harm.*" (Emphasis added).

See also "limits of liability" section for work loss benefits which states:

(a) The maximum amount payable for work loss shall not exceed the lesser of
(1) $800 per month, or
(2) the monthly earnings for the period during which the *accidental harm* results in the inability of the eligible injured person to engage in available and appropriate gainful activity, reduced by the actual earnings of the eligible injured person for such month.

This monthly amount shall be pro rated when the period of work loss is less than a month.

(Emphasis added).

State Farm's position, if adopted, would frustrate the legislative intent to allow payment of work loss benefits in cases of death. Under State Farm's analysis, eligible beneficiaries would never receive any work loss benefits in cases of death, since the payment of survivors' loss benefits would preclude payment of work loss benefits. We believe that by expressly allowing payment of work loss benefits in cases of death, the legislature intended that these payments be in addition to survivors' loss benefits.

To hold otherwise would lead to the anomalous situation wherein the insurer would pay less benefits in cases of death, where the injuries are presumably more severe, than in cases involving non-fatal injuries. We do not believe that the legislature intended such an inequitable result. As we recently stated in *Hudson v. Uwekoolani,* 65 Haw. 468, 472-73, 653 P.2d 783, 787 (1982), "If the injured person was entitled to these [work loss] benefits had he lived and been permanently incapacitated, his estate should be entitled to receive these same benefits if he died." *Accord, Yamaguchi v. State Farm Mutual Automobile Insurance Co.,* 515 F. Supp. at 195; *Georgia Farm Bureau Mutual Insurance Co. v. Nelson,* 153 Ga. App. 623, 629-30, 266 S.E.2d 299, 303 (1980).

We thus hold that plaintiff is entitled to a maximum recovery of provable work loss benefits up to the increased aggregate limit of the additional coverage, less the amount of survivors' loss benefits already received. The trial court thus properly denied State Farm's cross-motion for summary judgment, which would have required that the court find that an insurer is only obligated to pay a maximum of $15,000 in all cases of death.

We are, however, compelled to reverse the trial court's grant of summary judgment in favor of plaintiff. Although under our holding today, plaintiff would be entitled to provable work loss benefits, in addition to the survivors' loss benefits already paid, the record as it exists on appeal is barren of any evidence of the earnings loss suffered by plaintiff's decedent. There is nothing in the record in this case which indicates decedent's loss of earnings, probable future earnings, life expectancy or expected earning capacity. The only factual

reference to decedent's work loss is a brief statement in a supplemental memorandum that decedent had been employed as a school teacher for many years, a statement which is not supported by any affidavit as required under HRCP Rule 56(e).

It is a well-established principle that on a motion for summary judgment, the record must be adequate for decision of the legal issues presented. 6 Pt.2 J. Moore & J. Wicker, Moore's Federal Practice ¶ 56.15[7] (2d ed. 1982). Otherwise summary judgment must be reversed and, in the discretion of the appellate court, remanded for additional proceedings. *See Hawaiian Insurance and Guaranty Company v. Fernandez,* 3 Haw. App. 95, 98, 641 P.2d 1365, 1367 (1982). We accordingly remand the case for additional evidence of work loss to support the judgment below.

### III.

The final issue on appeal is whether plaintiff is the proper recipient of the no-fault benefits due under her husband's policy. State Farm contends for the first time on appeal that it is not obligated to pay plaintiff any no-fault benefits because plaintiff has filed suit in her capacity as a personal representative of decedent's estate, rather than as a "legal representative of [the decedent], for the benefit of the surviving spouse and any dependent, as defined in section 152 of the Internal Revenue Code of 1954, of [the decedent]," which State Farm maintains is required under HRS § 294-4(1)(B).

State Farm's contention is without merit. It is apparent from the record that State Farm has previously tendered survivors' loss benefits to plaintiff, in her capacity as the personal representative of decedent's estate. State Farm's claim representative informed plaintiff's counsel, soon after Tom Mizoguchi's death, that State Farm would be "making payment to *the estate of Tom T. Mizoguchi*" and requested the name of the *"administrator or administratix [sic] of the estate"* so that benefits could be tendered. (Emphasis added). In its answer to plaintiff's complaint, State Farm admitted that it had "tendered to Plaintiff the sum of $14,174.68." By its use of the term

"plaintiff," State Farm acknowledged that it had made payments to Miharu Mizoguchi in her capacity as "personal representative of the estate of Tsutomi Mizoguchi, aka Tom Tsutomu Mizoguchi" and at the same time conceded plaintiff's right to receive these payments.

It would seem unfair for State Farm to refuse to pay additional no-fault benefits to plaintiff, when State Farm had made prior payments to plaintiff and informed plaintiff's counsel that State Farm would tender any payments due under the policy to the administratrix of the estate.

Since the question of plaintiff's capacity to receive additional no-fault benefits was not raised or properly reserved in the court below, State Farm's contention on this issue would ordinarily be deemed waived. *See Miller v. Leadership Housing Systems, Inc.,* 57 Haw. 321, 325, 555 P.2d 864, 867 (1976); *Fujioka v. Kam,* 55 Haw. 7, 9, 514 P.2d 568, 570 (1973); *City and County of Honolulu v. Manoa Investment Co.,* 1 Haw. App. 52, 56, 613 P.2d 662, 665 (1980). Nevertheless, although we are not required to consider a contention made for the first time on appeal, we will briefly address this issue to dispel any confusion the parties might have.

*Ronald Y. K. Leong (James Kawashima* with him on the briefs; *Kobayashi, Watanabe, Sugita & Kawashima,* of counsel) for defendant-appellant.

*Meyer M. Ueoka (Antonio V. Ramil* with him on the brief; *Ueoka & Luna,* of counsel) for plaintiff-appellee.