STATE OF HAWAII, Plaintiff-Appellee, *v.* VIDADO B. DUMLAO, Defendant-Appellant

NO. 10321

(CRIMINAL NO. 60251)

JANUARY 22, 1986

BURNS, C.J., HEEN AND TANAKA, JJ.

174

OPINION OF THE COURT BY HEEN, J.

Defendant Vidado B. Dumlao (Dumlao) appeals from his conviction of murder. Hawaii Revised Statutes (HRS) § 707-701 (1976).[1] He argues on appeal that the trial court erred in refusing to give his requested manslaughter instruction. Relying on *State v. O'Daniel*, 62 Haw. 518, 616 P.2d 1383 (1980), he contends there was sufficient evidence that he shot his mother-in-law, Pacita M. Reyes (Pacita), while "under the influence of extreme mental or emotional disturbance for

---

[1]Hawaii Revised Statutes (HRS) § 707-701(1) (1976) defines murder as follows:
    Murder.   (1) Except as provided in section 707-702, a person commits the offense of murder if he intentionally or knowingly causes the death of another person.

which there [was] a reasonable explanation" to support an instruction under HRS § 707-702(2) (1976).[2] We agree and reverse.

The trial court instructed the jury that they could find Dumlao guilty of manslaughter if they concluded that he had recklessly shot Pacita to death, HRS § 707-702(1)(a) (1976),[3] but refused to give the instruction Dumlao had requested.[4]

After a jury trial, Dumlao was convicted of murder for shooting Pacita, and of reckless endangering in the first degree, HRS § 707-713 (Supp. 1984), for shooting and injuring his brother-in-law, Pedrito Reyes (Pedrito). He does not appeal the reckless endangering conviction.

The questions presented are: (I) what is the meaning of the language of HRS § 707-702(2); and (II) was there evidence to support the giving of Dumlao's requested instruction?

----

[2]HRS § 707-702(2) reads as follows:
Manslaughter. * * *
(2) In a prosecution for murder it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the view-point of a person in the defendant's situation under the circumstances as he believed them to be.
Although the statute refers to the mental state of a defendant as a defense, it is really a mitigating factor. "Intentionally killing while under the influence of extreme emotional disturbance does not present a true 'defense,' for the punishment is merely reduced through the mechanism of denominating the crime as 'manslaughter' rather than 'murder.' It could be considered a 'partial defense' in the sense that an acquittal of the charge of murder occurs when the jury finds that the defendant is guilty only of manslaughter." *State v. Ott*, 297 Or. 375, 377 n.2, 686 P.2d 1001, 1003 n.2 (1984).

[3]HRS § 707-702(1)(a) reads as follows:
Manslaughter. (1) A person commits the offense of manslaughter if:
(a) He recklessly causes the death of another person[.]

[4]The proffered instruction reads as follows:
(1) A person commits the offense of manslaughter if:
(a) He recklessly causes the death of another person.
(2) In a prosecution for murder it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the view-point of a person in the defendant's situation under the circumstances as he believed them to be.

I.

The guiding principle in statutory construction is to ascertain the intent of the legislature as gleaned primarily from the statutory language. *State v. Ahakuelo*, 5 Haw. App. 205, 207, 683 P.2d 400, 402 (1984). *See also State v. Ui*, 66 Haw. 366, 663 P.2d 630 (1983). However, where the language is ambiguous, we are not limited to the words of the statute, *State v. Ui, supra*, but we may look to other aids to statutory construction to assist us in determining legislative intent. *Treloar v. Swinerton & Walberg Co.*, 65 Haw. 415, 421, 653 P.2d 420, 424 (1982). The language of § 707-702(2) does not comport with the historical test for reducing a charge of murder to manslaughter, and we cannot determine from the language alone whether the legislature intended to effect a change in that test. Consequently, we must seek assistance from other sources.

The legislative history of § 707-702(2) is of no assistance, and we must look to the history of the offense of manslaughter generally and under Hawaii law,[5] and to materials construing the pertinent provision of the Model Penal Code (MPC), upon which our penal code, HRS Title 37, is based.

## HISTORY OF THE MITIGATING FACTOR IN MANSLAUGHTER

The principle that the presence of an extreme mental or emotional disturbance will reduce the offense of murder to manslaughter is a modification of the ancient distinction between slaying in cold blood and slaying in the heat of passion existing in Anglo-Saxon criminal law prior to the Norman conquest of 1066.[6] The "Doctrine of Provocation" became firmly established in the common law in 1628 and the distinction between murder and manslaughter turned on the presence of heat of passion caused by adequate provocation. Donovan and Wildman, *Is the*

---

[5]Hawaii has no common-law criminal offenses. *Marsland v. Pang*, 5 Haw. App. 463, 487 n.27, 701 P.2d 175, 193 n.27 (1985); HRS § 1-1 (1976); HRS § 701-102 (1976).

[6]For a short history of the provocation defense, *see* Donovan and Wildman, *Is the Reasonable Man Obsolete? A Critical Perspective on Self-Defense and Provocation*, 14 Loyola L. Rev. 435, 446-450 (1981).

*Reasonable Man Obsolete? A Critical Perspective on Self-Defense and Provocation,* 14 Loyola L. Rev. 435, 440 and 446 (1981) (hereafter *Donovan and Wildman*).

In the United States mutual combat, assault and adultery were gradually recognized as having been legally adequate provocation at common law to reduce murder to manslaughter. In some jurisdictions illegal arrest, injuries to third parties, and even words tending to give rise to heat of passion are sufficient provocation.[7] *Donovan and Wildman, supra,* at 446-447.

The determination of the adequacy of the provocation gradually became a jury prerogative in marginal cases, and the reasonable person test was devised to assist the jury. *Id.* at 447-48. Today the test has four elements: (1) provocation that would rouse a reasonable person to the heat of passion; (2) actual provocation of the defendant; (3) a reasonable person would not have cooled off in the time between the provocation and the offense; and (4) the defendant did not cool off. *Id.* at 448. *See also People v. Casassa,* 49 N.Y.2d 668, 427 N.Y.S.2d 769, 404 N.E.2d 1310, *cert denied,* 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 50 (1980). The reasonable person yardstick is strictly objective; neither the mental nor physical peculiarities of the accused are evaluated in determining whether the loss of self-control was "reasonable." *Donovan and Wildman, supra,* at 448-49.

## CRITICISM OF THE "REASONABLE PERSON" TEST

As originally developed the provocation defense focused on the mental state of the accused as the test for moral culpability; however, under the objective or "reasonable person" test the individual's mental state is not the determinative factor. *State v. Ott,* 297 Or. 375, 381, 686 P.2d 1001, 1005 (1984).

---

[7]Such words are not merely insulting or abusive ones, but rather those that convey information of a fact which would constitute a reasonable provocation if that fact were observed. For example, "a sudden confession of adultery by a wife, or information from a third person that a wife has been unfaithful, has sometimes been held to constitute a provocation to the husband of the same sort as if he had made an 'occular observation' of his wife's adultery." W. Lafave and A. Scott, *Handbook on Criminal Law,* § 76 at 576-77 (1972). *See also* R. Perkins, *Criminal Law* 61-63 (2d ed. 1969).

Some commentators have remarked on the inconsistency of the reasonable person test.

> The reasonable man test, being objective in nature, is antithetical to the concept of mens rea. Like all objective standards, it is an external standard of general application that does not focus on an individual accused's mental state. Thus, from the point of view of traditional Anglo-American jurisprudence, a paradox is inherent in the use of the reasonable man standard to test criminal responsibility: the presence or absence of criminal intent is determined by a standard which ignores the mental state of the individual accused.

*Donovan and Wildman, supra,* at 451 (footnotes omitted).

The objective test placed the jury in the conceptually awkward, almost impossible, position of having to determine when it is reasonable for a reasonable person to act unreasonably. *State v. Ott,* 297 Or. at 381-84, 686 P.2d at 1005-06; *see also* Ingber, *A Dialectic: The Fulfillment and Decrease of Passion in Criminal Law,* 28 Rutgers L. Rev. 861, 947 (1975).

> In the law of contract and tort, and elsewhere in the criminal law, the test of the reasonable man indicates an ethical standard; but it seems absurd to say that the reasonable man will commit a felony the possible punishment for which is imprisonment for life. To say that the "ordinary" man will commit this felony is hardly less absurd. The reason why provoked homicide is punished is to deter people from committing the offence; and it is a curious confession of failure on the part of the law to suppose that, notwithstanding the possibility of heavy punishment, an ordinary person will commit it. If the assertion were correct, it would raise serious doubts whether the offence should continue to be punished.
>
> Surely the true view of provocation is that it is a concession to "the frailty of human nature" in those exceptional cases where the legal prohibition fails of effect. It is a compromise, neither conceding the propriety of the act nor exacting the full penalty for it. This being so, how can it be that that paragon of virtue, the reasonable man, gives way to provocation?

Williams, *Provocation and the Reasonable Man,* 1954 Crim. L. Rev. 740, 742.

The MPC's response to this criticism is discussed below.

## HAWAII LAW PRIOR TO THE PENAL CODE

Prior to the effective date of the Hawaii Penal Code (HPC) in 1973, Hawaii statutorily defined manslaughter as any killing "without malice aforethought, and without authority, justification, or extenuation." HRS § 748-6 (1968). *See Commentary on § 707-702* (1976) (hereafter *Commentary*). Hawaii case law at that time adhered to the historical common-law principle of reducing murder in the first or second degree to manslaughter when mitigating mental or emotional disturbances were present. Hawaii case law employed the concept of "heat of passion," *The King v. Greenwell,* 1 Haw. 146 (1853), and recognized a more general approach, acknowledging extenuations attributable to individual mental and emotional weakness under the circumstances. *See Commentary, supra. See also The King v. Sherman,* 1 Haw. 150 (1853); *Greenwell, supra.* However, the latter, more liberal approach, was limited by the additional requirement that the killing be without malice and that the assailant had been provoked by the victim. *Commentary, supra; Greenwell, supra.*

### HRS § 707-702(2)[8]

Under HRS § 707-702(2), the two principal elements of the extenuating factor are established: (1) extreme mental or emotional disturbance and (2) an objective/subjective test of the reasonableness of the explanation for the disturbance. However, the nature of those elements are not clear from the language of the statute, and neither the *Commentary* nor the legislative history indicates what considerations go into making up those elements. *See* Sen. Conf. Comm. Rep. Nos. 1 and 2, in 1972 Senate Journal at 734-46; Sen. Stand. Comm. Rep. No. 599, in 1971 Senate Journal at 1067; Judicial Council of Hawaii, Penal Law Revision Project, *Hawaii Penal Code* (Proposed Draft) § 702 at 180 (1970).

Since HRS § 707-702(2) is derived from MPC § 210.3,[9] we may look

---

[8]See note 2, *supra.*

[9]Section 210.3 states in pertinent part as follows:
Manslaughter
    (1) Criminal homicide constitutes manslaughter when:

to the commentaries and cases from other jurisdictions explaining and construing that section for insight into the meaning of the language of our statute. *See Witherspoon v. Salm,* 251 Ind. 575, 579, 243 N.E.2d 876, 878 (1969); 73 Am. Jur. 2d *Statutes* § 166 (1974). We will examine the first element of § 707-702 first.

### A.

"Extreme mental or emotional disturbance" sometimes is, but should not be, confused with the "insanity" defense. The point of the extreme emotional disturbance defense is to provide a basis for mitigation that differs from a finding of mental defect or disease precluding criminal responsibility. *State v. Ott,* 297 Or. at 391, 686 P.2d at 1011. The disturbance was meant to be understood in relative terms as referring to a loss of self-control due to intense feelings. *Id.*

The extreme mental or emotional disturbance concept of the MPC must also be distinguished from the so-called "diminished capacity" defense.

The doctrine of diminished capacity provides that evidence of an abnormal mental condition not amounting to legal insanity but tending to prove that the defendant could not or did not entertain the specific intent or state of mind essential to the offense should be considered for the purpose of determining whether the crime charged or a lesser degree thereof was in fact committed.

*State v. Baker,* 67 Haw. 471, ___, 691 P.2d 1166, 1168 (1984).[10]

Although the MPC does *not* recognize diminished capacity as a distinct category of mitigation, II Model Penal Code and Commentaries

---

&ast;  &ast;  &ast;

(b) a homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be.

[10] In *Baker,* the supreme court, without reaching the issue, indicated that the adoption of the more lenient Model Penal Code standard of legal insanity pursuant to HRS § 704-400 (1976) raises the question of whether a diminished capacity defense requiring specific instruction enjoys a continued validity in our courts. In view of the above discussion, it appears it does not.

§ 210.3 at 72 (Official Draft and Revised Comments 1980) [hereafter cited as 1980 MPC Commentary], by placing more emphasis than does the common law on the actor's subjective mental state, it also may allow inquiry into areas which have traditionally been treated as part of the law of diminished responsibility or the insanity defense.

Thus, the MPC is said to have in fact adopted an expanded concept of diminished capacity to reduce murder to manslaughter. *People v. Spurlin,* 156 Cal. App. 3d 119, 127 n.4, 202 Cal. Rptr. 663, 668 n.4 (1984).

> Diminished capacity involves a mental disturbance which peculiarly involves the killer. Heat of passion is a concession to human weakness, to a universal human condition. *Diminished capacity is an effort to reduce punishment because the actor is not like all humans, whereas heat of passion reduces punishment because the actor is, unfortunately, like most humans.* [Footnotes omitted and emphasis added.]

Dressler, *Rethinking Heat of Passion: A defense in Search of a Rationale,* 73 J. Crim. L. and Criminology 421, 459-60 (1982) (hereafter *Dressler*).

The MPC merges the two concepts of heat of passion and diminished capacity.

> It is enough if the killing occurs while the defendant's capacity to form an intent to murder is diminished by an extreme mental or emotional *disturbance* deemed to have a reasonable explanation or excuse from the defendant's standpoint. [Emphasis included.]

*Spurlin, supra.*

An explanation of the term "extreme emotional disturbance" which reflects the situational or relative character of the concept was given in *People v. Shelton,* 88 Misc.2d 136, 149, 385 N.Y.S.2d 708, 717 (1976), as follows:

> [T]hat extreme emotional disturbance is the emotional state of an individual, who: (a) has no mental disease or defect that rises to the level established by Section 30.05 of the Penal Law;[11] and (b) is exposed to an extremely unusual and overwhelming stress; and (c)

---

[11]At that time, N.Y. Penal Law § 30.05 (McKinney 1975) set forth New York's insanity defense. The insanity defense is now set forth in N.Y. Penal Law § 40.15 (McKinney Supp. 1975 to 1984), and places the burden of proof of insanity on the defendant.

has an extreme emotional reaction to it, as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.[12] [Footnotes added.]

It is clear that in adopting the "extreme mental or emotional disturbance" concept, the MPC intended to define the provocation element of manslaughter in broader terms than had previously been done. It is equally clear that our legislature also intended the same result when it adopted the language of the MPC.[13]

We turn then to the second prong of our analysis, the test to determine the reasonableness of the explanation for the mental or emotional disturbance. It is here that the most significant change has been made in the law of manslaughter.

---

[12]The extreme emotional disturbance defense is also broader than the heat of passion doctrine which it replaced, in that a cooling off period intervening between the fatal act and the disturbance does not negate the defense. *People v. Parmes*, 114 Misc. 2d 503, 505, 451 N.Y.S.2d 1015, 1017 (1982). "A spontaneous explosion is not required." *Id.* Rather, "a significant mental trauma" could have "affected a defendant's mind for a substantial period of time, simmering in the unknown subconscious and then inexplicably coming to the fore." *People v. Shelton*, 88 Misc.2d 136, 144, 385 N.Y.S.2d 708, 715 (1976). *See also People v. Parmes, supra.*

The drafters of the Model Penal Code (MPC) found it "shocking" that the common law disregarded the fact that the passage of time sometimes served only to increase rather than diminish outrage. MPC § 201.3 at 48, Comments (Tent. Draft No. 9, 1959). They said:

Though it is difficult to state a middle ground between a standard which ignores all individual peculiarities and one which makes emotional distress decisive regardless of the nature of its cause, we think that such a statement is essential. For surely if the actor had just suffered a traumatic injury, if he were blind or were distraught with grief, if he were experiencing an unanticipated reaction to a therapeutic drug, it would be deemed atrocious to appraise his crime for purposes of sentence without reference to any of these matters. They are material because they bear upon the inference as to the actor's character that it is fair to draw upon the basis of his act. So too . . . where lapse of time increased rather than diminished the extent of the outrage perpetrated on the actor, . . . it was shocking in our view to hold this vital fact to be irrelevant.

[13]As noted in II Model Penal Code and Commentaries § 210.3 at 64-65 (Official Draft and Revised Comments 1980), however, it is implicit that extreme emotional disturbance will not reduce murder to manslaughter, if the actor has intentionally, knowingly, recklessly, or negligently brought about his own mental disturbance, such as by involving himself in a crime.

B.

The anomaly of the reasonable person test was corrected by the drafters of the MPC through the development of an objective/subjective test of reasonableness. *See* 1980 MPC Commentary, *supra. Dressler, supra,* at 431, explains that,

> it makes the test more, although not entirely, subjective, by requiring the jury to test the reasonableness of the actor's conduct, "from the viewpoint of a person in the actor's situation." Thus, the actor's sex, sexual preference, pregnancy, physical deformities, and similar characteristics are apt to be taken into consideration in evaluating the reasonableness of the defendant's behavior. (Footnotes omitted.)

This more subjective version of the provocation defense goes substantially beyond the common law by abandoning preconceptions of what constitutes adequate provocation, and giving the jury wider scope. *Id.*

Under the prior law of provocation, personal characteristics of the defendant were not to be considered. Under the MPC a change from the old provocation law and the reasonable person standard has been effected by requiring the factfinder to focus on a person in the defendant's situation. Thus, the MPC, while requiring that the explanation for the disturbance must be reasonable, provides that the reasonableness is determined from the defendant's viewpoint. The phrase "actor's situation," as used in § 210.3(b) of the MPC, is designedly ambiguous and is plainly flexible enough to allow the law to grow in the direction of taking account of mental abnormalities that have been recognized in the developing law of diminished responsibility. 1980 MPC Commentary, *supra,* at 72.

Moreover, the MPC does not require the provocation to emanate from the victim as was argued by the State here. *Spurlin,* 156 Cal. App. 3d at 127 n.4, 202 Cal. Rptr. at 668 n.4; 1980 MPC Commentary, *supra,* at 60-61.

In light of the foregoing discussion and the necessity of articulating the defense in comprehensible terms, we adopt the test enunciated by the New York Court of Appeals in *People v. Casassa,* 49 N.Y.2d 668, 427 N.Y.S.2d 769, 775, 404 N.E.2d 1310, 1316, *cert. denied,* 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 50 (1980):

[W]e conclude that the determination whether there was reasonable

explanation or excuse for a particular emotional disturbance should be made by viewing the subjective, internal situation in which the defendant found himself and the external circumstances as he perceived them at the time, however inaccurate that perception may have been, and assessing from that standpoint whether the explanation . . . for his emotional disturbance was reasonable, so as to entitle him to a reduction of the crime charged from murder . . . to manslaughter . . . . [Footnote omitted.]

The language of HRS § 707-702(2) indicates that the legislature intended to effect the same change in the test for manslaughter in Hawaii's law as was made by the MPC. Therefore, we hold that under HRS § 707-702(2) the broader sweep of the emotional disturbance defense applies when considering whether an offense should be reduced from murder to manslaughter. To hold that the pre-penal code law of provocation continues to hold sway would be to render the language of § 707-702(2) meaningless. *State v. Smith,* 59 Haw. 456, 460-62, 583 P.2d 337, 341 (1978); *see* HRS § 701-104 (1976).

Thus, we hold in the instant case that the trial court was required to instruct the jury as requested by Dumlao, if there was any evidence to support a finding that at the time of the offense he suffered an "extreme mental or emotional disturbance" for which there was a "reasonable explanation" when the totality of circumstances was judged from his personal viewpoint.

We turn now to the question of whether there was evidence to support the proffered instruction.

## II.

In the instant case, there was evidence of the following:

Arthur Golden, M.D., Dumlao's expert witness, stated at trial that his diagnosis of Dumlao was one of "paranoid personality disorder," which is a "long range, almost lifetime or certainly over many, many years, emotional or mental disorder. It is almost a way of functioning."

Dr. Golden diagnosed Dumlao as having unwarranted suspiciousness, one of the basic indicators of the "paranoid personality disorder." That unwarranted suspiciousness included pathological jealousy, which Dumlao suffered throughout his ten-year marriage. Dumlao harbored the belief that other males, including his wife's relatives, were somehow sexually involved with her. He could never figure out exactly who or

where or how, yet this extreme suspiciousness persisted.

Dr. Golden described the second major sign of Dumlao's paranoid personality disorder as hypersensitivity, characterized by being easily slighted or quick to take offense, and a readiness to counterattack when a threat was perceived. For example, when somebody glanced or gazed at his wife, he would consider it a personal affront and could well believe that a sexual overture had been made to her. Dr. Golden believed that at the time of the offense Dumlao felt the need to counterattack because Dumlao perceived a very substantial threat. Dr. Golden stated that "[p]erhaps an ordinary individual in his situation would not have. He did."

Dr. Golden gave other examples from Dumlao's history, illustrating his extreme and irrational reactions to outwardly normal events.

Dr. Golden's observations were supported by the testimony of the State's witnesses Eduardo, Agapito and Pedrito Reyes, his brothers-in-law, as well as Florentina, his wife, and Gaudencio Dumlao, his father. For example, according to Florentina, during their entire marriage Dumlao's extreme jealousy had caused him to beat and kick her, throw a knife at her, threaten her with his gun. He threatened on numerous occasions to beat or kill her. Dumlao accused her of having sexual relations with her brothers. Moreover, he would get angry for no more reason than that she might be behind some man in the checkout line at the store, and Dumlao would conclude that she was "talking to him or whatever, like that" and become jealous.

Dumlao's extreme and irrational jealousy concerning his wife was known to all the family members. According to Agapito, they couldn't even talk to their sister in Dumlao's presence. "If we have to talk to her, we have to talk from a distance because he suspects us." Furthermore, Dumlao "never allowed us to talk in a group."

Dumlao's testimony, describing his own perceptions of the night in question, further confirms the nature of his extreme jealousy. Dumlao described how he became suspicious and jealous of his wife that night because of the way that Agapito looked at him:

A.  I had this feeling that something going to happen when I leave because the action that I seen — Agapito.

Q.  What action?

*   *   *

A.  He look at me on, the kine. He make sure — he make sure

that — I don't know, making sure if I stay — if I leave the house or I don't know so I got the bad feeling so I never leave.

\* \* \*

Q. Why did you have this feeling that he would go into your wife's bedroom?
A. Jealousy arose.

\* \* \*

Q. What did you do? Did you do anything after you went back to your bedroom?
A. I wake up my wife, questioned her.

\* \* \*

A. If he — if she had something to do with my brother-in-law, Agapito.
Q. What do you mean, had something to do with your brother-in-law, Agapito?

\* \* \*

A. Sexual relation.

\* \* \*

Q. What happened after you insisted on her answering you?
A. She got up so I lay down — I laid down on the bedroom so I — I kick or push her on the side over there.

Dumlao went on to describe how, after his father had counseled him and he went back in the room, he could hear the voices of the others talking in the living room. He thought that they were talking about him. He then came out to "investigate" with his gun in his waistband. He saw "Pedrito with his eyes at me, burning eye, angry eye, angry," and he saw Eduardo and Agapito alongside Pedrito. Dumlao testified that Pedrito rushed at him holding a knife in his hand, saying, "My sister suffer ten years. You going to pay. Now you going to pay". He testified that when he pulled his gun to "try and scare [Pedrito]," the gun went off, firing the bullet that struck and killed Pacita.

## CONCLUSION

Reviewing the evidence within the context of the meaning of HRS § 707-702(2), we conclude that it was sufficient to require the trial court to give Dumlao's requested instruction on manslaughter. *State v. O'Daniel, supra.* There was evidence, "no matter how weak, inconclusive or unsatisfactory," *id.* at 527-28, 616 P.2d at 1390, that Dumlao killed Pacita while under the influence of "extreme emotional disturbance." Whether a jury will agree that there was such a disturbance or that the explanation for it was reasonable we cannot say. However, Dumlao was entitled to have the jury make that decision using the objective/subjective test.

The fact that the other witnesses contradicted his testimony concerning an attack by Pedrito, and that his testimony that he was only trying to scare Pedrito does not comport with the manslaughter defense, does not detract from Dumlao's right to the instruction based on the above evidence. Dumlao was entitled to an instruction on every theory of defense shown by the evidence. *See State v. O'Daniel, supra.* It was the jury's province to determine the weight and credibility of that evidence.

Reversed and remanded for new trial.

*Anthony K. Bartholomew* (*Brook Hart* with him on the briefs; *Hart, Wolff & Wilson* of counsel) for defendant-appellant.

*Peter Van Name Esser,* Deputy Prosecuting Attorney, City & County of Honolulu, for plaintiff-appellee.