[Crim. No. 15501. Fourth Dist., Div. One. May 21, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
CLYDE RICHARD SPURLIN, Defendant and Appellant.

122

COUNSEL

E. Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, John W. Carney and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BUTLER, J.**—Clyde Richard Spurlin appeals his jury convictions of first degree murder of his nine-year-old son Scott and second degree murder of his wife Peggy, contending the court erred in failing to give a requested manslaughter instruction as to Scott's death, that error tainted his second degree murder conviction for Peggy's death and the evidence does not support his first degree murder conviction for Scott's death. We affirm.

I

Spurlin married Peggy in 1972. Scott was born in 1973 and their daughter Carrie in 1977. The first years of their marriage were uneventful. They joined a church and were viewed as a religious couple. In 1981, they embarked upon a new lifestyle, initially acting out Peggy's sexual fantasies, then moving on to involvements with others. With Spurlin's permission, Peggy dated other men and had an affair with a coworker. She reported these events to Spurlin and with his permission quit her nine-to-five job as an office worker and became a nude dancer at Dirty Dan's in San Diego.

Her sexual escapades escalated to include lesbian episodes, mate-swapping and possible employment as a call girl. Spurlin contracted a venereal disease from Peggy. His reluctant acquiescence in Peggy's sexual activities began to cool and they agreed she would return to school.

On the night of the murders, November 2, 1982, Spurlin picked up Peggy at Dirty Dan's, they had a couple of drinks there, returned home and had some more. The children were fed, bathed and bedded. Spurlin and Peggy

felt good and sat around talking. Spurlin told Peggy about three or four call girls he had patronized in earlier years during business trips. Peggy became angry, withdrew and went upstairs to their bedroom, telling Spurlin not to bother her, and responding to his question about the marriage being over: "I don't know . . . all I feel like is I just want to die." Spurlin went to the kitchen, gulped some tequila and went upstairs to the bedroom. Peggy told him to leave her alone. He felt ill, nauseous, and went to the bathroom. Peggy looked in on him and returned to bed. Spurlin next remembered standing by her bed, hammer in hand, striking her with it, Peggy saying, "Don't hurt me, Rich," strangling her and knotting a tie around her neck. Death was caused by strangulation. The hammer was broken. Spurlin went downstairs to the garage, got another hammer, returned to the bedroom where Scott was sleeping and killed him with a hammer blow to the head. He also knotted a tie around Scott's neck. Entertaining thoughts of killing Carrie and himself, he walked around the house, crying, and concluded he could not kill Carrie. Packing up some clothes, he and Carrie drove to Los Angeles. Spurlin sold his car, used the money for tickets under an assumed name to Hawaii where they stayed two days and then returned. Spurlin wrote his employer the bodies of his wife and son were in the family home where they were found by the police on November 5, 1982. Spurlin voluntarily returned to San Diego, confessed to the crimes and related all the details to the jury.

## II

The court instructed the jury on the elements of first degree and second degree murder as to both killings and on voluntary manslaughter as to Peggy's killing only. The court told the jury the manslaughter instruction did not apply to Scott's killing. The court and counsel debated at length whether the voluntary manslaughter instruction should include Scott's killing. The court concluded as a matter of law the provocation to trigger the heat of passion to reduce homicide to manslaughter must emanate from a source other than an innocent victim. As Scott slept throughout the evening, the court reasoned he could not have provoked Spurlin to a heat of passion and refused the instruction.

## III

Manslaughter is the unlawful killing of a human being without malice aforethought (Pen. Code,[1] § 192). █ Voluntary manslaughter is killing as a result of "a sudden quarrel or heat of passion" sufficient to displace the element of malice. The shorthand reference to "a sudden quarrel or heat

---

[1]All statutory references are to the Penal Code unless otherwise specified.

of passion" is provocation; it is the element of provocation that distinguishes voluntary manslaughter from other crimes. (1 Witkin, California Crimes (1963) Crimes Against The Person, § 332, p. 304.) The amount of provocation necessary to reduce a charge from murder to voluntary manslaughter has always plagued jurists and legal commentators. Obviously, only slight provocation or passion which has had time to subside are insufficient to overcome legal malice. (CALJIC No. 8.42 (1979 Rev.).) The fundamental inquiry is whether "the defendant's reason was, at the time of his act, . . . disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." (*People* v. *Logan* (1917) 175 Cal. 45, 49 [164 P. 1121].) "Adequate provocation" must be affirmatively demonstrated at trial. (*People* v. *Williams* (1969) 71 Cal.2d 614, 624 [79 Cal.Rptr. 65, 456 P.2d 633].)

At common law, the concept of "adequate provocation" was extremely limited. *People* v. *Valentine* (1946) 28 Cal.2d 121 [169 P.2d 1], undertakes an historical survey of the development of the concept. The Crimes and Punishments Act of 1850, section 23, following common law principles, provided: "In cases of voluntary manslaughter there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing." (*Id.*, at p. 138.)

When section 192 was enacted by the California State Legislature in 1872, no such express limitation was included in the definition of voluntary manslaughter. As *Valentine* points out, it is arguable the Legislature intended the common law limitations to apply as the Code Commissioners' notes to section 192 state: "No words of reproach, however grievous, are sufficient provocation to reduce the offense of an intentional homicide from murder to manslaughter." (*Id.*, at p. 138.)

As a result, two lines of case authority developed. Commencing with *People* v. *Turley* (1875) 50 Cal. 469, 471, several cases adhered strictly to the "serious and highly provoking injury" principle of common law. These courts reasoned: "Such provision was probably omitted from the code upon the ground that it was entirely unnecessary and surplusage, being simply a reiteration of a principle of law settled and established by all text-writers on the subject." (*People* v. *Bruggy* (1892) 93 Cal. 476, 481 [29 P.26].)[2]

---

[2]*Turley* and its descendants, including *Bruggy*, have been overruled by *People* v. *Valentine, supra,* 28 Cal.2d 121.

Another line of cases following *People* v. *Hurtado* (1883) 63 Cal. 288, 292, held a killing to be manslaughter when committed under the influence of passion caused by *any* insult or provocation sufficient to excite an irresistible passion in a reasonable person. Thus, "adequate provocation" was an issue to be determined by the jury based on the facts and circumstances of the particular situation. (*People* v. *Valentine, supra,* 28 Cal.2d at p. 139.) These cases did not require any specific type of provocation and verbal provocation was held to be sufficient. (See *People* v. *Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777].) Adequate provocation did not necessarily mean rage or anger, but included "any '[v]iolent, intense, high-wrought or enthusiastic emotion' " (*People* v. *Borchers* (1958) 50 Cal.2d 321, 329 [325 P.2d 97].) ▉ From this latter line of cases, there developed in California a judicially-recognized crime of "nonstatutory voluntary manslaughter" (see *People* v. *Small* (1970) 7 Cal.App.3d 347, 355 [86 Cal.Rptr. 478]); this crime differs from the statutory definition of voluntary manslaughter in that the element of malice may be rebutted by a showing of diminished mental capacity instead of the provocatory conduct of the victim. (See *People* v. *Conley* (1966) 64 Cal.2d 310, 324-326 [49 Cal.Rptr. 815, 411 P.2d 911].)

On appeal, Spurlin contends the court erred as a matter of law in refusing to give the manslaughter instruction with reference to the killing of his son, Scott. The question presented, therefore, is whether Spurlin's crime fits into either of these judicially developed definitions of manslaughter.

IV

At trial, the trial judge instructed the jury concerning manslaughter with regard to the facts surrounding Peggy's death. ▉ The trial court refused to give the manslaughter instruction with regard to Scott's death, however, because Spurlin's sleeping son was not the source of "adequate provocation" under section 192. The court summarized its review of the applicable law as follows: "If the mental state is produced by some other source, the offense is second degree murder, as it was at common law." Spurlin argues the trial court erred in refusing to give the manslaughter instruction; there is no requirement the victim be the source of the provocation for manslaughter to apply.

It is true section 192 does not expressly state voluntary manslaughter only applies to situations involving adequate provocation *by the victim.* Counsel have cited us to no California cases dealing directly with the question of whether the provocation necessary to reduce the charge from murder to

manslaughter must be caused by the victim.[3] However, statutory voluntary manslaughter derives from common law principles (see *People* v. *Graham* (1969) 71 Cal.2d 303, 315 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Small, supra,* 7 Cal.App.3d at p. 355) and several courts in other jurisdictions, interpreting common law principles, have held the deceased must be the source of the defendant's rage or passion. (See *State* v. *Fowler* (Iowa 1978) 268 N.W.2d 220, 224; *Tripp* v. *State* (1977) 36 Md.App. 459 [374 A.2d 384, 389]; *State* v. *Russo* (1910) 24 Del. 538 [77 A. 743]; *State* v. *Yanz* (1901) 74 Conn. 177 [50 A. 37]; *Shufflin* v. *People* (1875) 62 N.Y. 229.) In each of these cases, the defendants' murder convictions were upheld against their contentions they were entitled to manslaughter instructions as to their "non-provoking" victims. As a result, legal commentators have summarized common law principles regarding "adequate provocation" as follows: "[T]he provocation must have been given by the person who was killed, except in those cases in which the wrong person was killed by accident or mistake, or deceased was present aiding and abetting the person causing the provocation." (40 C.J.S., Homicide, § 53, p. 917; see also 40 Am.Jur.2d, Homicide, § 59, p. 352.)

In this case, the trial court correctly gave the manslaughter instruction as to Peggy's death. Her fury at Spurlin's disclosure of earlier call girl activities can be said to have ignited his long-smoldering resentment of her sexual conduct bringing about an intense, high-wrought reaction leading to her death. However, Scott's killing lacks both elements necessary to warrant a manslaughter instruction based on provocation and heat of passion. Spurlin confessed to the police and testified before the jury Scott's life was taken, not as a result of rage or passion or anger aroused by Scott but as part of a plan to eliminate the Spurlin family. Under common law principles, Scott's death was not the consequence of adequate provocation or heat of passion directed at him. (*People* v. *Brubaker* (1959) 53 Cal.2d 37, 44 [346 P.2d 8].)

V

Spurlin's arguments are best directed, not at the statutory definition of voluntary manslaughter, but rather to the judicially created category of manslaughter based on diminished capacity. Restated, Spurlin's contention is: If sufficient evidence of provocation and heat of passion required the

---

[3]*People* v. *Saterfield* (1967) 65 Cal.2d 752, 759-760 [56 Cal.Rptr. 338, 423 P.2d 266], limited manslaughter instructions to the death of a wife killed by her husband who claimed provocation and denied the instruction as to a daughter killed by the defendant while she telephoned the police. No defense was offered by the defendant on the guilt phase and there was nothing in the People's case to permit any inference of manslaughter on any theory as to the daughter's death.

manslaughter instruction to be given as to Peggy, then Spurlin continued to be under the whip of that provocation and subject to the demon of that unhinged mind when he killed Scott; the passion aroused by Peggy's provocatory attitude carried over to Scott's killing and negated the malice necessary to prove the offense of murder.

A persuasive argument can be made the defense of diminished capacity should be enlarged to contemplate the extreme emotional disturbance resultant from a heat of passion provoked by one other than the victim as negating malice in murder and reducing the offense to manslaughter. ██ The definition of manslaughter has not been limited by California courts to the specific nonmalicious acts spelled out in section 192. A finding of provocation sufficient to reduce murder to manslaughter is not the sole means by which malice can be negated and voluntary manslaughter established. As discussed above, under California law, a person who intentionally kills may be incapable of harboring malice aforethought because of a mental disease, defect or incapacitation. (*People* v. *Conley, supra,* 64 Cal.2d 310, 318.) "Mental incapacitation" has been liberally construed to include such things as "voluntary intoxication" (*People* v. *Mosher* (1969) 1 Cal.3d 379, 391 [82 Cal.Rptr. 379, 461 P.2d 659]), an honest but unreasonable belief the defendant is in imminent peril of loss of life or serious injury (*People* v. *Flannel* (1979) 25 Cal.3d 668, 679, 683 [160 Cal.Rptr. 84, 603 P.2d 1]) and "high-wrought and enthusiastic emotion" (*People* v. *Borchers, supra,* 50 Cal.2d 321, 329). Logically, we see no reason why Spurlin's emotional state could not be used to negate malice in the killing of both Peggy *and* Scott.[4]

However, in 1981, the California Legislature enacted Penal Code section 28, subdivision (b), which states: "As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication proceeding." In June 1982, the electorate of the state adopted Proposition 8 which also

---

[4]Model Penal Code (1980) American Law Institute, section 210.3, states: "(1) Criminal homicide constitutes manslaughter when: . . . (b) a homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be."

The Model Penal Code therefore rejects the legislative simplicity of section 192, subdivision 1 and adopts an expanded concept of diminished capacity to reduce murder to manslaughter. The elements of provocation and heat of passion are included within this broadened concept. The Model Penal Code does not require the provocation arousing the heat of passion to emanate from the victim (Comments to § 210.3 at p. 61). It is enough if the killing occurs while the defendant's capacity to form an intent to murder is diminished by an extreme mental or emotional *disturbance* deemed to have a reasonable explanation or excuse from the defendant's standpoint.

purports to abolish the defense of diminished capacity in cases such as this one. Penal Code section 25, subdivision (a), added as a result of the ballot initiative, provides: "The defense of diminished capacity is hereby abolished. In a criminal action, as well as any juvenile court proceeding, evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged."

The express purpose of both statutes is to abolish the diminished capacity defense and eliminate the judicially created concept of "non-statutory voluntary manslaughter." (Ballot Pamp., Prim. Elec. (June 8, 1982) p. 34; Atty. Gen.'s Guide to Prop. 8 (1982) p. 8-3.) There are differences on the interaction between sections 25, subdivision (a), and 28, subdivision (b). One view states the statutes cover the same subject and the later enactment therefore supersedes the 1981 statute; another approach deems the statutes "complementary" and recommends that both be given effect. (Witkin, Cal. Crim. Procedure (1983 Supp.) Part 1, § 23L, p. 51.) From either viewpoint the mandate is clear—diminished capacity has been abolished as a defense to murder. (See *People* v. *Jackson* (1984) 152 Cal.App.3d 961, 968 [199 Cal.Rptr. 848].)

 We are therefore barred from further consideration of Spurlin's argument on appeal he was entitled to a voluntary manslaughter instruction under the diminished capacity theory. The diminished capacity concept is no longer available to "negate" malice aforethought and, thus, reduce murder to manslaughter.

## VI

There are two answers to Spurlin's innovative argument the heat of passion engendered by Peggy's provocation carried over to negate malice aforethought in Scott's murder.

First, we find no evidence in the record of mental defect or disease. Provocation and heat of passion are not synonymous with diminished capacity. (*People* v. *Berry, supra,* 18 Cal.3d 509, 517; *People* v. *Conley, supra,* 64 Cal.2d 310, 318.)

Second, diminished capacity is no longer available to reduce murder to manslaughter. (§§ 25 and 28.)

## VII

Spurlin contends his second degree murder conviction for Peggy's death is tainted by the court's refusal to instruct the jury on manslaughter as to

Scott's death. The contention is not supported by argument or by reference to the record. We do not consider it further.

■ Finally, Spurlin argues the evidence is insufficient to establish the elements of first degree murder in Scott's death. ■ The jury verdict must be upheld if supported by substantial evidence which must be viewed in the light most favorable to the People. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 575-579 [162 Cal.Rptr. 431, 602 P.2d 738, 16 A.L.R.4th 1255].)

■ Substantial evidence supports the conviction. Spurlin planned Scott's murder. He decided to kill the entire family. Following Peggy's death, he went to the garage to replace the broken hammer. He selected a ball-peen hammer. He reentered the house and returned upstairs. He stood over Scott, deliberating for a few moments. He struck a strong blow with the hammer, killing his son. He turned away to enter Carrie's bedroom. He thought upon it. He decided he could not kill her. He packed some clothes and fled, selling the car and using an assumed name. Substantial evidence thus supports Spurlin's planning for Scott's death, his motive in killing the boy and the premeditated use of the hammer as the death weapon. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 27 [73 Cal.Rptr. 550, 447 P.2d 942].)

Judgment affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 9, 1984.