[No. B028643. Second Dist., Div. Four. July 20, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHANIE HEATHER MOLINA, Defendant and Appellant.

---

**COUNSEL**

Louis H. Bernstein for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Susanne C. Wylie, Donald E. de Nicola Tricia Ann Bigelow and Lisa S. Berger, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**WOODS, P. J.**—Appellant Stephanie Heather Molina was found guilty of second degree murder while using a knife (Pen. Code, §§ 187, 12022, subd. (b)), found not guilty by reason of insanity, and committed to the California Department of Mental Health for a period not to exceed 15 years to life. She contends that the trial court committed reversible error at her guilt trial by refusing requested instructions on the lesser included offenses of voluntary and involuntary manslaughter. We agree, and reverse.

Appellant admitted the homicide of her 18-month-old son. The issue below was only the degree of her culpability. Over the prosecutor's objection, the trial court properly permitted the defense to present evidence on the issue of appellant's actual ability to form the requisite mental states for the crime. The court also instructed the jury to utilize the evidence of *mental illness in deciding whether appellant actually formed the requisite* mental states. The court refused, however, to instruct on voluntary or involuntary manslaughter. The jurors therefore had no option other than acquittal if they determined that appellant had been unable to form malice or the intent to kill.

The prosecution's evidence established that on June 7, 1986, appellant killed her son by stabbing him repeatedly in the heart. She then inflicted life-threatening wounds to her own chest, set fire to her house, and resisted efforts to remove her from the house. A garbled suicide note was found.

The defense evidence showed that after the crime, appellant spent six days in a hospital's intensive care unit and then transferred to the psychiatric ward for four or five weeks. A hospital psychiatrist (Dr. Hayes)

diagnosed her as having a major depression with psychotic features, including auditory hallucinations which gave her commands. She also suffered from delusions that her husband and mother were going to kill her and that people were out to get her and her son.

In Dr. Hayes's opinion, appellant became psychotic about two days before the homicide. Tests for drugs were negative. There was no evidence that her illness was feigned.

Appellant testified that in the months after the baby was born she became increasingly depressed and anxious and had trouble eating, sleeping, and leaving the house. She began hearing voices, and thought her mother was going to kill her and the baby.

Appellant further testified that on the day before the killing she drove off to visit friends nearby and next found herself driving in San Diego. That evening she thought that her husband wanted her dead. The voices told her that she had to die. Her husband, a medical doctor, gave her some medicine so she could sleep. The next morning, after her husband left for work, the voices told her that she had to die and take her son with her. She put her son in his crib and strangled him. Then she got a knife from the kitchen and stabbed herself. When she saw her son lying very pale in the crib, she stabbed him. At some point she talked briefly on the telephone to a friend who called her. She then started several fires in the house.

Appellant's husband, mother and best friend all testified that she had been a warm, happy, extroverted person who underwent a major personality change following the birth of her son. She became dejected, overwhelmed by routine household tasks, and obsessed with the fact that a planned family move to her parents' home in Arizona did not occur because her brother moved there instead. She told nobody that she was hearing voices. When her friend called her on the day of the homicide, appellant had spoken in a monotone, sounded ill, and had not recognized the friend's voice. The homicide had come as a complete surprise to everyone.

We find merit in appellant's argument that the trial court should have instructed on voluntary and involuntary manslaughter as lesser included offenses.

At appellant's request, the trial court gave a modified form of CALJIC No. 3.36 which stated: "Evidence has been received regarding a mental disease or mental disorder of the defendant at the time of the offense charged. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state

which is an element of the crime charged to-wit: specific intent to kill, premeditation and deliberation, malice aforethought[,] all of which have been previously defined in these instructions."

The trial court then instructed only on first and second degree murder (CALJIC Nos. 8.10, 8.20, 8.30). It refused requested defense instructions to the effect that an unlawful killing was manslaughter and not murder where "the defendant does not have the ability because of a mental disease or mental disorder [to] premeditate [and] deliberate [or] to have malice aforethought" (CALJIC No. 8.50 (1987 rev.)); that voluntary manslaughter was an unlawful killing without malice aforethought but with an intent to kill (CALJIC No. 8.40 (1979 re-rev.)); that involuntary manslaughter is an unlawful killing without malice aforethought and an intent to kill (CALJIC No. 8.45 (1980 rev.)); and that voluntary and involuntary manslaughter were lesser included offenses for which the jury could convict if it was not convinced beyond a reasonable doubt of guilt of the charged crime (CALJIC No. 17.10 (1984 rev.)).

Defense counsel argued below that the requested instructions were appropriate because under Penal Code sections 25, 28 and 29 the jury could consider whether appellant actually formed each of the requisite mental states. After denying a request by the prosecutor to strike much of the evidence regarding appellant's mental state, the trial court rejected the defense request for manslaughter instructions on the ground there was no evidence to support them. In so ruling, the court erred.

 Penal Code section 25 provides in pertinent part: "(a) The defense of diminished capacity is hereby abolished. In a criminal action, . . . evidence concerning an accused person's . . . mental illness . . . shall not be admissible to show or negate *capacity to form* the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged."[1] (Italics added.)

Penal Code section 28, subdivision (a) states in pertinent part that evidence of *mental illness* "shall not be admitted to show or negate the *capacity*

---

[1] We do not view section 25, subdivision (c) as pertinent. It states: "Notwithstanding the foregoing, evidence of diminished capacity or of a mental disorder may be considered by the court only at the time of sentencing or other disposition or commitment." Subdivision (c) does not mean that evidence that a defendant actually lacked the specific intent for a crime is inadmissible on the issue of guilt. "[I]t is clear that subsection (c) is an authorization for the court to consider mental state at the time of disposition as an exception to the otherwise general rule of exclusion established in subsection (a). This conclusion is fortified by the use of the term 'the court' rather than a phrase such as the 'trier of fact,' since only the court sentences." (Cal. Department of Justice, Attorney General's Guide to Proposition 8 (Cont.Ed.Bar. 1982) Criminal Practice After Proposition 8, p. 260.) "A defendant may still introduce evidence of lack of specific intent due to mental disorder when specific intent is in issue at the guilt phase of a trial." (*Id.,* at p. 259.)

*to form* any mental state," but "is admissible solely on the issue of whether or not the accused *actually formed* a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." Subdivision (b) of that section forecloses the defenses of diminished capacity, diminished responsibility, or irresistible impulse as "a matter of public policy . . . ."

■ Penal Code section 29 declares: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

■ The apparent meaning of the statutory language is that evidence of mental problems is inadmissible to show that a defendant *lacked the capacity to form* the requisite mental state, but is admissible to show that the defendant *actually lacked the requisite mental state.* ■ An expert may testify regarding the defendant's mental condition so long as the expert gives no opinion on the ultimate question of whether or not the defendant actually had the requisite mental state.

In *People* v. *Jackson* (1984) 152 Cal.App.3d 961 [199 Cal.Rptr. 848], the trial court ruled that defense psychiatric witnesses could give their opinion that the defendant was mentally ill at the time of the crime, but could not testify on the ultimate conclusion of law. *Jackson* held that the evidentiary restrictions of Penal Code sections 28 and 29 did not deprive the defendant of his due process right to present a defense. (*Id.,* at pp. 967-970.) The offense was reduced from attempted murder in the first degree to attempted murder in the second degree due to omission of an instruction relating premeditation to the mental state defense. (*Id.,* at p. 970.)

In *People* v. *Spurlin* (1984) 156 Cal.App.3d 119 [202 Cal.Rptr. 663], upon which respondent heavily relies, the defendant killed his sexually promiscuous wife after drinking and quarreling with her. He then killed his sleeping nine-year-old son. Following his conviction for first degree murder of the son and second degree murder of the wife, he contended on appeal that the trial court erred in instructing on voluntary manslaughter only as to the wife. The *Spurlin* court disagreed. It found no evidentiary basis for manslaughter as to the son, since he himself gave no provocation which could trigger heat of passion, and since the judicially-created category of manslaughter where malice is rebutted by a showing of diminished capacity was abolished by Penal Code sections 25 and 28. (*Id.,* at pp. 123-128.)

It is highly significant that there was no evidence of mental defect or disease in *Spurlin.* (156 Cal.App.3d at p. 128.) The court therefore had no reason to consider the language of Penal Code section 28, subdivision (a) which permits evidence of mental disease, defect or disorder on the issues of actual formation of specific intent, premeditation and deliberation, and malice. ■ "Whenever possible, effect should be given to the statute as a whole, and to its every word and clause, so that no part or provision will be useless or meaningless, . . ." (58 Cal.Jur.3d, Statutes, § 105, p. 479; *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 638 [268 P.2d 723].) ■ The inclusion of the language in subdivision (a) regarding actual formation of mental states shows that the Legislature did not foreclose the possibility of a reduction from murder to voluntary manslaughter where malice is lacking due to mental illness, or a further reduction to involuntary manslaughter where intent to kill is not present for the same reason. Respondent has ignored the significance of that language, in arguing that under *Spurlin,* the abolition of the diminished capacity defense means there was no way that appellant could be guilty of manslaughter rather than murder.

Similarly, *People v. Coad* (1986) 181 Cal.App.3d 1094, 1106 [226 Cal.Rptr. 386], states that the recent statutory amendments abolish the possibility of proving manslaughter based on diminished capacity, but does not consider whether manslaughter could be proven where the defendant actually lacked malice due to mental illness.

The opinion by the Third District in *People v. Whitler* (1985) 171 Cal.App.3d 337 [214 Cal.Rptr. 610], is more apposite.

The defendant in *Whitler* killed her estranged "common-law" husband. A psychiatrist and psychologist were permitted to testify regarding her mental disorders and her mental condition at the time of the killing. The defendant was precluded from introducing capacity evidence or asking her experts whether she had the requisite mental state at the time of the shooting. *Whitler* found no constitutional problem with the abolition of the diminished capacity defense or restriction on expert testimony. (171 Cal.App.3d at pp. 340-342.) The concurring opinion of Justice Sims went on to discuss an instructional issue not reached by the majority. The concurrence recognized that a defendant "may still defend against a charge of homicide by presenting evidence of mental disease or defect sufficient to raise a reasonable doubt that he or she in fact had the requisite mental state at the time of the offense. [Citation.]" (*Id.,* at p. 343.) It found no sua sponte duty to give instructions relating the evidence of mental disease to the mental states required for both murder and manslaughter, but recognized that the trial court might well have a duty to give such instructions upon request.

Similarly, both *In re Thomas C.* (1986) 183 Cal.App.3d 786, 797, footnote 4 [228 Cal.Rptr. 430], and *People v. Lynn* (1984) 159 Cal.App.3d 715, 731 [206 Cal.Rptr. 181], recognized that abolition of the diminished capacity defense does not preclude a defendant from showing that he did not actually form the requisite mental state.

■ Here, the trial court properly allowed evidence of mental illness, including psychiatric testimony; no capacity evidence was elicited and the psychiatrist did not testify on the ultimate issue. Moreover, the jury was told to consider evidence of mental illness on the question of the formation of the requisite mental states. The court erred, however, in its refusal to give requested instructions on the alternatives to acquittal if the jury found that those mental states were lacking.

■ "The requirement of instructions on lesser included offenses is based on the elementary principle that the court should instruct the jury on every material question. [Citation.] The state has no interest in a defendant obtaining an acquittal where he is innocent of the primary offense charged but guilty of a necessarily included offense. Nor has the state any legitimate interest in obtaining a conviction of the offense charged where the jury entertains a reasonable doubt of guilt of the charged offense but returns a verdict of guilty of that offense solely because the jury is unwilling to acquit where it is satisfied that the defendant has been guilty of wrongful conduct constituting a necessarily included offense. Likewise, a defendant has no legitimate interest in compelling the jury to adopt an all or nothing approach to the issue of guilt." (*People v. St. Martin* (1970) 1 Cal.3d 524, 533 [83 Cal.Rptr. 166, 463 P.2d 390].)

In *People v. Geiger* (1984) 35 Cal.3d 510, 520 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055], our Supreme Court recently reiterated the importance of lesser included offense instructions, stating: "Instructions on lesser offenses are required because a procedure which affords the trier of fact no option other than conviction or acquittal when the evidence shows that the defendant is guilty of some crime but not necessarily the one charged, increases the risk that the defendant may be convicted notwithstanding the obligation to acquit if guilt is not proven beyond a reasonable doubt. The pressures which create that risk thus affect the reliability of the fact finding process and thereby undermine the reasonable doubt standard."

■ Here, defense counsel was given no option other than to ask the jury to return a not guilty verdict, even though the jury had heard appellant admit killing her child. The evidence that appellant was suffering from serious mental illness at the time of the killing clearly presented a factual issue of whether she could form malice and the intent to kill. Since the jury

was not instructed on voluntary and involuntary manslaughter, despite the existence of evidence to support those lesser included offenses, and the issue was not resolved adversely to appellant under the instructions which were given, we must reverse appellant's conviction. (*People* v. *Edwards* (1985) 39 Cal.3d 107, 116-117 [216 Cal.Rptr. 397, 702 P.2d 555].)

The judgment is reversed.

McClosky, J., and Goertzen, J., concurred.