Filed 2/28/14  In re Gonzalez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re SERGIO GONZALEZ<br><br>on Habeas Corpus. | G044464<br><br>(Super. Ct. No. 06CF2893 &<br>M-13731)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING; NO CHANGE IN<br>JUDGMENT |

It is ordered that the opinion filed February 10, 2014, be modified as follows:

On page 14, at the end of the second full paragraph, after the last sentence beginning with "We need not here decide" add a sentence to read:

Whether defendant's belief that he "found who did it," was a reasonable belief under the circumstances of this case would be a question of fact for the fact finder.

This modification does not change the judgment.


RYLAARSDAM, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re SERGIO GONZALEZ<br><br>on Habeas Corpus. | G044464<br><br>(Super. Ct. No. 06CF2893 &<br>M-13731)<br><br>O P I N I O N |

*        *        *

Original proceeding; petition for a writ of habeas corpus to challenge an order of the Superior Court of Orange County, Richard F. Toohey, Judge.  Petition granted.

Peter Gold for Petitioner and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton, Scott C. Taylor and Marrisa Bejarano, Deputy Attorneys General, for Plaintiff and Respondent.

*        *        *

Petitioner Sergio Gonzalez filed a petition for writ of habeas corpus challenging his conviction for second degree murder. He contends he was denied his state and federal constitutional rights to the effective assistance of appellate counsel. His claim is based on defense counsel's failure to argue on appeal that the instruction on voluntary manslaughter based on heat of passion was erroneous. With his petition he filed a declaration from Nancy J. King, the lawyer who represented him in the earlier appeal. In it, King stated she had not taken the issue into account when preparing the appeal but "[h]ad I considered this instruction more closely, I would have raised an issue on appeal contesting it."

For the reasons explained below, we grant the petition.

PROCEDURAL BACKGROUND

This court affirmed petitioner's conviction on August 17, 2009. (*People v. Gonzalez* (Aug. 17, 2009, G040209) [nonpub. opn.].) The only issue raised in that appeal was whether the sentence imposed constituted cruel and unusual punishment. Thereafter petitioner filed a petition for writ of habeas corpus in the Orange County Superior Court. It alleged he was denied effective assistance of counsel on appeal because his lawyer failed to argue that he was entitled to a reversal based on an erroneous jury instruction. The superior court denied the petition on the grounds petitioner had an adequate remedy at law in the form of a motion to recall the remittitur, which could be filed in this court.

Petitioner filed a petition for habeas corpus and a motion to recall the remittitur in this court. He also filed a request for judicial notice of the briefs, pleadings, motions, orders, and record on appeal in case number G040209. We granted the request for judicial notice of the specified documents and denied the petition for habeas corpus and the motion to recall the remittitur.

2

Thereafter, petitioner filed a petition for review in the California Supreme Court, which issued its order granting the petition and transferring it to this court. The Supreme Court ordered this court to vacate its order denying the habeas petition and to issue an order to show cause returnable before this court. We issued such an order and thereafter issued an opinion granting the petition.

The Attorney General then filed a petition for review in the California Supreme Court. The Supreme Court granted the petition and deferred consideration until disposition of a related issue in *People v. Beltran (Beltran)*. Subsequently, the Supreme Court decided (*Beltran* (2013) 56 Cal.4th 935) and transferred this case to us with directions to vacate our decision and reconsider the cause in the light of that decision, *People v. Verdugo* (2010) 50 Cal.4th 263 (*Verdugo*), and *People v. Butler* (2009) 46 Cal.4th 847 (*Butler*). We have reconsidered this case in the light of these decisions and again grant the petition.

FACTS

We repeat the facts as stated in our earlier opinion.

"Defendant Sergio Gonzalez was convicted of the second degree murder of Sam Chea. True findings were made that he personally discharged a firearm causing the victim's death and that he personally used a firearm in the murder. The jury returned a not true finding that he committed the crime for the benefit of a criminal street gang. He was found not guilty of street terrorism. The court sentenced defendant to 40 years to life in prison.

"Santa Ana Police Officer Jesus Delabarcena went to the scene of a stabbing at Century High School on September 11, 2006. His description of defendant was: 'Very emotional. He appeared to be very angry, and when his mom showed up, he became a little bit more emotional and went to her and gave her a hug.' Defendant told

3

his mother 'not to worry that he knew who had done it, it was some Chinos, in Spanish, Chinese.' Defendant then placed a telephone call.

"Five persons were arrested for stabbing Oscar Gonzalez, defendant's 14-year-old brother. All five claim an allegiance to a criminal street gang known as Tiny Rascals or TRG. Oscar Gonzalez, who died two days after he was stabbed, claimed the Little Minnie Street gang. The victim of the shooting murder, Sam Chea, whose moniker was Midget, was a member of WDC or We Don't Care gang. The three who were arrested and charged with the instant shooting, defendant, Abel H. and Antonio Barboza, were also members of the Little Minnie Street gang.

"Defendant was 15 on September 11, 2006. 'Some girl' called him at about 3:00 p.m. and said his brother was surrounded by a lot of people and was being stabbed. She said to hurry over. Defendant ran to Century High School. When he got to the scene of the stabbing, he was told his brother had been attacked by Cambodians. At one point, while he was at the scene, he was placed in a police car and overheard a police officer 'radio that the people who had hurt my brother were five Asian gang members from TRG or WDC.'

"Afterward, Barboza twice asked defendant what he was going to do about it. Defendant started walking towards the train tracks. He heard footsteps behind him, and turned to see Barboza and Abel. He looked over the fence and saw three people. 'I knew one of them was Phany, she was from WDC.' Defendant said: 'And at that same time Tony handed me something. I looked over and it was a gun.' He said that was the first time he realized Barboza was carrying a gun, and that he had intended to fight 'whoever came [a]long that was a gang member that hurt my little brother,' but with his hands. Defendant placed the gun into his waistband. He looked over and saw a car with three male Asian gang members inside.

"Defendant walked up to the car and asked the victim where he was from. The response was 'We Don't Care,' as well as a gang sign for 'W.' To defendant that

4

meant 'The Asian gang WDC.' At trial, defendant said he thought somebody from WDC had stabbed his brother. He said: 'In my head I said I found who did it, and I shot into the car.' Then he looked around and 'everything seemed brighter, whiter. I seen two figures running away and I assumed it was Tony and Abel so I followed them.'

"Abel was 13 years old when he testified, but 12 on the day of the murder. He said he was in the sixth grade on September 11, 2006, when his friend, Oscar Gonzalez, was stabbed. After the stabbing, Abel was sitting outside some apartments when defendant's uncle dropped him off. Defendant started walking around and Abel said, 'we started following him like we had to run to catch up to him.' Abel saw Tony pass something to defendant. The prosecutor asked who Tony was, and Abel answered: 'Tony, the one that got sentenced on this case.' They saw a car and Sergio 'hit them up,' which is a 'gang thing' for 'tell[ing] where they [are] from.' Abel said he turned his back and then heard a gunshot and started running.

"Phany Sam claimed the We Don't Care gang in the past, but no longer does. On September 11, 2006, she saw a shooting. She said she was 'walking and I just saw a group of people walking all wearing white T-shirts.' She estimated there were 'like 13' people coming from the railroad tracks right behind her apartment building. She said she 'saw them coming up to a black car where my brother's friend's car was.' Her brother's friend was named Midget; he was seated in the front passenger seat. Two others were in the car. Phany saw 'some guy' pull out a gun. The others surrounded the car. She heard three shots and went into her house. Phany said she remembered telling a detective that she 'recognized the guy who shot the gun as Sergio Gonzalez.'

"Matthew McLeod, who works for the Santa Ana Police Department, is the detective who interviewed Phany on September 19, 2006. Phany told McLeod that defendant shot the gun that day and that she knew defendant's brother Oscar. McLeod said: 'She told us that from her vantage point, which was approximately 20 feet from the victim vehicle, if you will, she saw Sergio Gonzalez, who was wearing a white T-shirt at

5

the time, lift up his T-shirt and withdraw a handgun using his right hand from his waistband area, pointed it at the front passenger side of the vehicle and fired I think two shots that she said, into the vehicle.'

"McLeod testified as a gang expert. The prosecutor asked him about retaliation, and he responded: 'In terms of respect in the criminal street gang subculture, any action that's taken or any sign of disrespect must immediately be met with either the same and usually and I say usually, 99 percent of the time, a higher or greater level of disrespect such that, if I'm a gang member and another gang member looks at me in a disrespectful fashion, which is usually termed "mad dogging," if a rival gang member stares at me menacingly, then the onus is upon me to take some action, and that action is [fisticuffs], if I have a weapon, stabbing them, something like that.' He said that if a member of a gang were stabbed, it would be 'very, very, very strange . . . for there not to be any type of retaliation.'

"The prosecutor posed a hypothetical question, which included the same facts in the instant case, to McLeod and asked his opinion about whether or not the hypothetical murder was committed for the benefit of the Little Minnie Street gang. McLeod said it definitely was. He explained the hypothetical gang members were acting 'in concert to conduct the crime.' He said the hypothetical murder 'benefits the Little Minnie Street gang not only in exacting revenge, if you will, or retaliation for the primary or initiating a stabbing, but also garners respect for the gang as a whole as well as the individual members including the victim of the stabbing.'

"After hearing petitioner's younger brother had been stabbed, petitioner and their mother went to the scene of the crime. Petitioner appeared angry and acted very emotionally. Petitioner and his mother went to the hospital; thereafter petitioner's uncle took him home. The events constituting the crime occurred after he had been returned to his home."

6

DISCUSSION

*1. Our earlier analysis.*

We previously analyzed the case in our prior opinion as follows.

"At the request of petitioner's attorney, the court instructed the jury on voluntary manslaughter, based on heat of passion, as a lesser included offense. The version of CALCRIM No. 570 in effect and given to the jury stated in part that a 'killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion' and that this situation prevails if three elements are satisfied: '1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and [¶] 3. The provocation would have caused an ordinary person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.' (CALCRIM No. 570.) This is a correct and unambiguous statement of the rule.

"But the instruction went on to say: 'It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. *In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts. . . .*' (The italicized portion of the instruction is at issue here.) The instruction as given could be taken to mean the jury is to decide whether reasonable person would have acted rashly as a result of the provocation. But it could also be interpreted to mean the jury should consider whether the provocation would have caused a reasonable person to kill. And that is not the test.

7

"Voluntary manslaughter is the unlawful killing of another without malice 'upon a sudden quarrel or heat of passion.' (Pen. Code, § 192, subd. (a); See *People v. Koontz* (2002) 27 Cal.4th 1041, 1086.) 'A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] "'To satisfy the [objective or] "reasonable person" element . . . the accused's heat of passion must be due to 'sufficient provocation.'" [Citations.]' (*People v. Moye* (2009) 47 Cal.4th 537, 549.) As petitioner points out, the "'"provocation'"[must be] sufficient to cause an ordinary person of average disposition to act rashly and without deliberation. [Citation.]" The focus is on the provocation—the surrounding circumstance—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion.' (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.)

"Yet, as noted, the instruction as given might be interpreted to mean that the test is not only whether a reasonable person would have been provoked, but also whether a reasonable person, when so provoked, would have committed the killing. Thus, the language at issue is, at best, ambiguous. And the ambiguity was recognized, resulting in a 2008 amendment to the language at issue in CALCRIM No. 570 as follows: '*In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.*'" (Italics added.)

"'"'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." [Citations.] "'""[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'"'" [Citations.] The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury. [Citations.]' (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

8

"Defense counsel's closing argument on this point was limited. She argued, in the language of the instruction, that heat of passion would reduce the charge to voluntary manslaughter 'if the defendant was provoked as a result of provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment, and . . . the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is from passion rather than from judgment.'"

"'The prosecutor's argument was more extensive. He stated, 'But you know where voluntary manslaughter fails, is the next element. The next element is absolutely not met. The provocation would have caused a person of average disposition to act rashly and without due deliberation[,] that is from passion rather than from judgment. [¶] It is the reasonable persons standard. . . . But that's where this fails.' He went on: '[I]t's not the rage person standard. It's not the reasonable gang member standard either. It is the reasonable person standard. What would a reasonable person *do* under the circumstances.' (Italics added.) He further argued, '[I]t is not a 15-year-old gangster standard, it is a reasonable person, it is a person of average, ordinary prudence[,] *what they could do*, a reasonable person, under the circumstances.' (Italics added.) Finally, he stated, 'That's what [is] infuriating here, and in a state of anger he lashed out, as a 15-year old might do. Maybe a 25-year old won't *do that*, but that's not the standard that we're talking about here. Maybe a 25-year-old pauses, thinks about it, whatever. But you know what, this 15-year-old acted out of rage and went and killed a completely innocent person.'" (Italics added.)

"Each of these statements highlights an act, what a reasonable person might 'do.' The jury heard a version of this three times from the prosecutor. It is not difficult to see it could have believed voluntary manslaughter required that a reasonable person would have 'done that' or 'could kill.' And the ambiguous language of the instruction would only have emphasized that understanding. None of either counsel's arguments

9

addressed the ambiguity or specifically told the jury it was not to consider whether a reasonable person in defendant's position would have killed. All of this taken together would support a conclusion the jury understood it had to decide whether a reasonable person would have committed the murder. This was error.

"And based on all the circumstances of the case we cannot deem the error to be harmless. The jury rejected the prosecution's argument that the killing was deliberate, premeditated, and for the benefit of a criminal street gang. In doing so it presumably found there was sufficient provocation. Had the instruction unambiguously stated the law, it is reasonably probable defendant would have obtained a more favorable result. (*People v. Breverman* (1998) 19 Cal.4th 142, 178 [erroneous instruction on lesser included offense analyzed under standard in *People v. Watson* (1956) 46 Cal.2d 818, 836.)

"The determination the error was not harmless leads to the conclusion there was ineffective assistance of counsel. In making such a determination we must find not only that there was error but that but for counsel's failure to raise the issue defendant would have obtained a better result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2 674].) Here, had this issue been briefed by defendant's lawyer in the appeal, based on our analysis in this opinion we would have remanded the case for a new trial."

*2. Our analysis under the remand order.*

*a. Beltran, Verdugo, and Butler*

*(1) Beltran*

In *Beltran*, the jury convicted defendant of second degree murder. (*Beltran, supra,* 56 Cal.4th at p. 945.) Our Supreme Court analyzed the history of "heat of passion," starting with the common law and continuing through California statutory law. The court disagreed with the Attorney General that "heat of passion" to reduce

10

murder to manslaughter must be of the kind that would cause "an ordinary person of average disposition [to] *kill*." (*Id.* at p. 949.) Instead the court reiterated a rule promulgated in a venerable case, *People v. Logan* (1917) 175 Cal. 45, "the fundamental 'inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" (*Beltran, supra,* 56 Cal.4th at pp. 938-939.) Thus, the focus of "heat of passion" is not on whether the person of average disposition would kill, but rather whether such a person would be "liable to act rashly or without due deliberation and reflection." (*Id.* at p. 939.) And "[a]dopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act." (*Id.* at p. 949.)

The *Beltran* court also defined "heat of passion" as "a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*Beltran, supra,* 56 Cal.4th at p. 942.)

In *Beltran* the defense theory was that defendant had killed his girlfriend in the heat of passion after she had told him she had aborted her pregnancy. Defendant had testified the victim insulted him by calling him a "'"'fucking illegal,'"'" a "'"'nobody,'"'" and that "she '"could get better than [him].'"'" (*Beltran, supra,* 56 Cal.4th at p. 941.) According to defendant, she then stated "'"'Fuck you. I was right. I knew you were going to walk away someday. That's why I killed your bastard. I got an abortion.'"'" (*Ibid.*) Defendant's contention was that the news of the abortion "was so disturbing that

11

defendant acted not from reflection but in reaction to the provocation." (*Id.* at p. 943, fn. omitted.)

The court recognized that both parties and the trial court agreed that heat of passion might apply even if defendant intended to kill the victim. (*Id.* at p. 943.) The trial court's instruction to the jury included the sentence "'[i]n deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.'" (*Id.* at p. 944, italics omitted.) The court decided that this instruction was not ambiguous. (*Id.* at p. 954.) But the closing argument, in the language of the court, "muddied the waters." (*Ibid.*) The prosecutor offered "examples that a reasonable person would not kill if '[y]ou stub your toe' or get 'cut off in traffic.'" (*Ibid.*) This suggested "that the jury should consider the ordinary person's conduct and whether such a person would kill" – not the correct standard. (*Ibid.*) The court noted that this "may have confused the jury's understanding of the court's instructions." (*Id.* at p. 955.) But the court concluded that, reviewing any error for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, it was not reasonably probable that the jury was misled. In reaching this conclusion, the court relied in part on an inquiry from the jury during deliberations and the court's response to that inquiry. (*Beltran, supra,* 56 Cal.4th at p. 956.)

During its deliberations, the jury had sent a note inquiring "'"'[i]n deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.' Does this mean to commit the same crime (homicide) or can it be other, less severe, rash acts [?]'"'" (*Beltran, supra,* 56 Cal.4th at p. 945.) The trial court responded, "'[t]he provocation involved must be such as to cause a person of average disposition in the same situation and knowing the same facts to do an act rashly and

under the influence of such intense emotion that his judgment or reasoning process was obscured.'" (*Ibid.,* fn. omitted.)

### *(2) Verdugo*

As directed by the Supreme Court, we also reviewed *Verdugo*. In *Verdugo* defendant was convicted of two first degree murders. There was evidence that an attack on defendant's friend during a party provoked defendant into killing one of his victims under the mistaken belief she was the attacker. And the trial court instructed the jury on voluntary manslaughter as a lesser included offense to murder with respect to this particular victim. (*Verdugo, supra,* 50 Cal.4th at p. 293.) Defendant contended the court erred in not giving the same instruction in connection with the second victim.

Citing *People v. Avila* (2009) 46 Cal.4th 680, the Supreme Court noted that a trial court is only obligated to instruct on lesser included offenses if there is substantial evidence supporting such an instruction. It cited the same case for the proposition that ""'[t]he provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim." [Citation.]'" (*Verdugo, supra,* 50 Cal.4th at p. 293.) Then the court concluded that, as to the second victim, the instruction was properly omitted because that victim neither caused the alleged heat of passion nor was there a basis to believe defendant reasonably believed that victim to have engaged in provocative conduct. (*Id.* at p. 294.) The court expressly rejected the view, expressed in *People v. Spurlin* (1984) 156 Cal.App.3d 119, that a voluntary manslaughter instruction may be appropriate when a victim ""'was present aiding and abetting the person causing the provocation.'"'" (*Verdugo, supra,* 50 Cal.4th at p. 294.)

*(3) Butler*

In *Butler* defendant had been convicted of two counts each of murder, robbery, and carjacking. During the penalty phase, the prosecution presented evidence defendant, while awaiting trial, had participated in the murder of another jail inmate. He contended the court erred in refusing to instruct the jury on a heat of passion manslaughter in connection with this homicide. The Supreme Court concluded there was insufficient evidence to support the instruction. The evidence showed that defendant and his cohort had planned the assault resulting in the homicide in advance which demonstrated they acted deliberately and upon reflection. Also, the claim that defendant was provoked by the presence of a "shank" was rejected because there was no evidence the victim had a role in producing the weapon and the court again noted """"[t]he provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim."""" (*Butler, supra,* 47 Cal.4th at pp. 868-869.)

*3. Applying Beltran, Verdugo, and Butler to the present case*

We know that the victims here were not, in fact, the ones who attacked defendant's little brother. Thus, if the heat of passion manslaughter instruction could only be given where the victim personally created the provocation, we could end our analysis here. But the instruction would also be proper if there was substantial evidence that defendant reasonably believed his victims committed the act. (*Verdugo, supra,* 50 Cal.4th at p. 293.) There was sufficient evidence to support such a finding. Defendant testified "in my head I said I found who did it, and I shot into the car." We need not here decide whether this alleged mistaken belief was true; his testimony to this effect does constitute substantial evidence.

Defendant, who was 15 at the time, testified he received a phone call indicating Oscar, his 14 year old brother with whom he was very close, was in a fight at

14

the high school. Defendant ran to the scene. When he arrived, he saw his brother laying on the sidewalk with blood all over his stomach. Police detained defendant and placed him in a police car. He overheard a police officer stating his brother had been hurt by "five Asian gang members from TRG or WDC." When defendant's mother arrived, he was crying.

After the ambulance took Oscar away, defendant and his mother went directly to Western Medical Center, the hospital where Oscar had been taken. The nurses at the hospital led defendant to believe his brother was dying. After he returned home, he started to walk towards railroad tracks near his apartment, wanting to get into a fight with "the people who did this to [his] brother." One of his friends, who accompanied him, handed him a gun. Then he saw a car with three Asian gang members. One of the persons in the car identified himself and the other occupants as members of the WDC gang. Defendant then stated "[i]n my head I said I found who did it, and I shot into the car. He stated that he was confused and distraught.

Thus it was appropriate for the court to instruct on heat of passion manslaughter as a lesser included offense. And the court properly instructed the jury with CALCRIM No. 570. The court added "'[i]n deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts. . . .'" (*Beltran, supra,* 56 Cal.4th at p. 954.) This statement does not directly contradict our Supreme Court's holding that "a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill*" would be error. (*Id.* at p. 949.)

Nevertheless, the instruction was sufficiently unclear to permit the prosecutor to imply that heat or passion manslaughter required a finding that the ordinary person of average disposition would be moved to kill. In defining the manslaughter standard, he argued "[i]t's not the rage person standard. It's not the reasonable gang member standard either. It's the reasonable person standard. *What would a reasonable*

15

*person do under the circumstances.*"  And again, "it is a person of average, ordinary, prudence *what they could do.*"  The inference is clear:  would a reasonable person kill under the circumstances?  But that is the very standard our Supreme Court rejected in *Beltran*.

Here, as in *Beltran,* the prosecutor's closing argument "muddied the waters." (*Beltran, supra,* 56 Cal.4th at p. 954.)  The *Beltran* court recognized this was a problem.  But the court found two reasons why these muddied waters did not require a reversal:  (1) in response to a jury question during deliberations, the court, clearly corrected the prosecutor's misstatement of the law (*id.* at p. 955-956), and (2) "evidence of provocation was both weak and contradicted" (*id*. at p. 956).  Neither of these reasons apply here. There was no request for clarification from the jury.  And here the evidence of provocation was strong and not contradicted.  The jury's rejection of the criminal street gang charge and enhancement removes the major motive the prosecution urged for the murder conviction.  Thus strengthening support for the probability that defendant was motivated by heat of passion.

Neither *Verdugo* nor *Butler* affects our conclusion.  The holdings in *Verdugo* that the instruction on heat of passion manslaughter is not required unless the evidence supports the giving of such an instruction and that the instruction is inappropriate for an aider and abetter have no application in this case.  Likewise, the holding in *Butler* that a heat of passion manslaughter instruction is inappropriate where the evidence does not support the giving of the instruction does not affect the outcome here.  We also noted that defendant's trial lawyer did not object to the misleading argument of the prosecutor.  We may attribute this to inadequate representation or uncertainty created by the jury instruction or uncertainty in the law before the Supreme Court decided *Beltran*.  In any event, under the circumstances of this case it would not be appropriate to treat the failure to object as a forfeiture of the issue.

16

DISPOSITION

The petition is granted.  The case is remanded to the trial court for a new trial.

RYLAARSDAM, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

17